**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Roberto RODRIGUEZ,**
**Defendant-Appellant.**

**No. 86–2093.**

United States Court of Appeals,
Seventh Circuit.

Argued May 26, 1987.

Decided Oct. 2, 1987.

Pamela S. Menaker, Wilmette, Wis., for defendant-appellant.

Gregory A. Vega, U.S. Atty., N.D. Ind., Hammond, Ind., for plaintiff-appellee.

Before WOOD, CUDAHY and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

The defendant-appellant, Roberto Rodriguez, was indicted with thirty-one co-defendants and, after a separate trial, found guilty of conspiring to distribute cocaine, possessing cocaine with intent to distribute, and using a telephone to facilitate the conspiracy. Rodriguez appeals the verdict on three grounds: (1) the fourth amendment requires the exclusion of evidence obtained when state police stopped Rodriguez's car without articulable suspicion; (2) insufficient evidence supports the jury's verdict of guilty of possessing cocaine with intent to distribute; and (3) the district court improperly admitted into evidence the fact that Rodriguez was once involved in an automobile accident with a co-conspirator. We affirm the conviction.

## I.

This case developed out of an investigation of a drug-distribution network in northern Indiana. The Drug Enforcement Agency (the "DEA") coordinated the investigation with various local law enforcement agencies and extensively employed electronic wire intercepts and surveillance. The investigation eventually focused on Jesus Zambrana, Sr. and his family and associates; a court-authorized wiretap was placed on Jesus Zambrana's phone between March and July 1985. As a result of information gained through this wiretap, the DEA suspected that a shipment of drugs would be transported from Miami, Florida to Gary, Indiana in late April. On April 29, 1985, the DEA staked out Interstate 65 in northwestern Indiana and observed and stopped a suspicious car. The driver and passenger were arrested and a subsequent search of the car uncovered a secret compartment containing nearly six kilograms of 92% pure cocaine. Also found was a roadmap that revealed a highlighted Miami-Chicago route and a handwritten phone number later learned to be an unpublished number assigned to Rodriguez.[1]

On May 14 and 15, 1985, again pursuant to information gained through the wiretap, the DEA conducted surveillance at a hotel in Hammond, Indiana, hoping to observe and discover the identity of an individual from Florida suspected of being a confederate of the Zambranas. DEA agents observed Jay Zambrana (son of Jesus Zambrana) meet with Rodriguez on May 14 and 15 at the hotel. (The DEA, however, did not then know Rodriguez's name). On May 15 Rodriguez and Jay Zambrana drove together to the residence of co-conspirator Andre Sanchez in Gary, Indiana, and shortly thereafter Rodriguez left Sanchez's house and headed south on Interstate 65. Suspecting that Rodriguez was a member of the drug conspiracy and believing that he might be leaving the area, the DEA decided to stop Rodriguez's car briefly to check his identification. The DEA asked the state police to carry out this task and they did so.

In July 1985 a federal grand jury returned a sixty-one count indictment charging thirty-two defendants, including Rodriguez, with various criminal violations. Rodriguez was separately brought to trial and convicted. He was sentenced in June 1986.

---

1. Rodriguez does not challenge on appeal the validity of the wiretaps, the arrests of the two couriers or the search of the car. We have no occasion, therefore, to consider either the legality of these state actions or Rodriguez's standing to challenge them.

## II.

### A. Stop of Rodriguez's Automobile

Rodriguez contends that his fourth amendment rights were violated when the state police stopped his automobile on Interstate 65 to check his identification. Specifically, Rodriguez urges three points. First, he contends that the initial *"Terry* stop" of his car was accomplished without reasonable and articulable suspicion that he had committed or was about to commit a crime. Second, he suggests that, even if the DEA surveilling agent had a reasonable and articulable suspicion, the state police who stopped his car had inadequate "collective" information to justify the stop. And third, Rodriguez charges that the stop blossomed into an illegal arrest when he was questioned in the state police car without probable cause.[2]

The government responds that the DEA agent did have a reasonable and articulable suspicion that Rodriguez was engaged in criminal activity, a suspicion gained by wiretap and surveillance suggesting that an individual would arrive from Florida to negotiate drug transactions with the Zambranas. The government also contends that the state police officer who actually stopped Rodriguez's car had adequate collective knowledge in relying on the DEA's presumed role in the investigation and on the admittedly skeletal message that the DEA wanted a "routine traffic stop" of Rodriguez. Finally, the government argues that the stop did not become an arrest when the officer merely sat in her patrol car with Rodriguez for a brief period while writing out a citation.

■ The district court considered these issues at some length and concluded that adequate suspicion and collective knowledge justified the stop. On these points, we agree first that the totality of the evidence held by the DEA agent who sought the investigatory stop amounts to a reasonable and articulable suspicion that Rodriguez had committed or was committing a crime. The DEA reasonably suspected that a visitor from Florida was coming to northwestern Indiana to meet with the Zambranas in furtherance of the drug-distribution conspiracy. Over a period of two days DEA agents observed Rodriguez, with a Florida license plate on his car, meeting with several suspected members of the conspiracy. The DEA then acted on its suspicions that Rodriguez was a conspirator. This was reasonable and articulable suspicion.

■ The issue of collective knowledge is perhaps more challenging. The Supreme Court has approved a stop by an officer who relies on an official bulletin:

> Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.

2. We note that Rodriguez apparently does not specifically challenge the *purpose* for the stop of his automobile, except as it figures in the general reasonableness analysis of the extent of the stop. This appeal does not present, therefore, the question whether a *Terry* stop of a car may ever properly be made solely to obtain the identity of an individual. If a police officer conducts a *Terry* stop solely to obtain identification as part of an ongoing investigation, with no intent to do anything more at that time, there might be a question whether the conventional rationale of a *Terry* stop was satisfied. The Supreme Court has held that questioning for identification purposes is not prohibited in a *Terry* stop, *see United States v. Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 682–83, 83 L.Ed.2d 604 (1985), but has also made clear that a detainee

need not respond at all, *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). Thus it seems likely that police in a *Terry* stop could not compel a detainee to produce identification on pain of arrest (although this may be dictated by the fifth, rather than the fourth, amendment). And the Supreme Court has cautioned that the special fourth amendment principles applicable to automobiles must be carefully limited, not used as a bootstrap to permit otherwise impermissible searches. *See United States v. Chadwick,* 433 U.S. 1, 11–13, 97 S.Ct. 2476, 2483–85, 53 L.Ed.2d 538 (1977). But, as we indicate below, we think the extent of the *Terry* stop was reasonable and justifiable in the case before us. In any event, any admission of evidence resulting from the stop of Rodriguez's car was harmless.

*United States v. Hensley,* 469 U.S. 221, 233, 105 S.Ct. 675, 683, 83 L.Ed.2d 604 (1985) (emphasis in original; citation omitted). We have approved a stop based on a "flash message"—eyewitness information transmitted by a police officer from the scene of a crime. *United States v. Longmire,* 761 F.2d 411 (7th Cir.1985). But the communication here was a request to make a "routine traffic stop" of Rodriguez's car for the purpose of identifying the driver. We do not believe that *Hensley* answers directly whether a police officer may rely "objectively" on such a request for a "routine traffic stop" of a car for identification.[3] Although the issue may therefore be novel, we think that, at least on the unusual facts of this case, the officer making the investigatory stop might reasonably rely on the request of another investigator. The requesting DEA agent had good grounds for articulable suspicion and the detaining officer had a reasonable basis for believing the request to be well-founded—even though she did not personally know the facts giving rise to the suspicion. Unlike *Hensley,* here the automobile to be stopped with its occupant was pointed out specifically by the requesting officer, and the detaining officer knew the requesting officer was coordinating a large investigation with local agencies. The state trooper was therefore merely acting as an "extension" or agent of the DEA agent and she could act on the DEA agent's suspicions.

■ The third issue—whether an arrest occurred when the police officer requested that Rodriguez sit in the patrol car with her for several minutes—is also interesting and perhaps close. *Cf. Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (routine traffic stop is "more analogous" to *Terry* stop than to formal arrest). Several factors are relevant in deciding whether a *Terry* stop has become an arrest including the officer's intent in stopping the individual, whether there was a search, whether, or how much, questioning occurred, whether there was a show of force and whether the person stopped could be said to have been taken into custody. Considering the particular circumstances under which the stop had to be made here, sitting in the patrol car for several minutes was merely a normal part of traffic police procedure for identifying delinquent drivers. The steps taken did not connote an intent to take Rodriguez into custody and do not seem to have gone beyond their ostensible purpose—to establish identification.

■ In any event, the questions surrounding collective knowledge and the possible occurrence of an arrest need not be decided because the information resulting from the stop (and used at trial) would inevitably have been discovered by the DEA by other means. Rodriguez contends that all of the evidence resulting from the *Terry* stop should have been excluded from his trial. The only substantial evidence gained by the allegedly unconstitutional stop, however, was the identification of the driver, Rodriguez.[4] The district court concluded that the totality of evidence adduced at trial rendered the evidence gained by the allegedly illegal stop harmless. Specifically, the court stated:

> [T]he evidence of the telephone number on the map found in the car containing the six kilograms of cocaine, registered to an individual named Roberto Rodriguez; evidence of the presence of an unidentified male, registered as Roberto Rodriguez in the Holiday Inn shortly after telephone intercepts indicated that an individual from Florida was scheduled to

---

**3.** A special request that a "routine" stop be conducted is, perhaps, an oxymoron. Given our disposition of this issue, however, we need not decide the issue whether such a request may in general be relied upon by a government officer receiving it.

**4.** Rodriguez argues that the police at the illegal stop noticed a green tote bag on the rear seat of Rodriguez's car, and that the prosecution at trial attempted to link this bag to a drug deal. Although Rodriguez apparently did not raise this argument to the district court, even if he had done so, we would not consider the evidence about a green tote bag to be of sufficient significance to overcome a harmless error conclusion. Any argument the prosecution made concerning a green tote bag went essentially to the question of Rodriguez's identity, not to any showing that he was carrying contraband.

meet with members of the Zambrana organization; as well as codefendant Andre Sanchez's testimony identifying Roberto Rodriguez, as the man who accompanied Jay Zambrana to Andre Sanchez's home on the day on which DEA Agent Trifon Magrames observed an unidentified male with Jay Zambrana; is sufficient independent evidence of defendant's identity. *United States v. Rodriguez,* 636 F.Supp. 1522, 1529 (N.D.Ind.1986) (order denying new trial). We agree that the additional identity evidence is strong independent evidence connecting Rodriguez to the conspiracy. Of course, the crucial issue is the *independence* of the evidence. The district court spoke in terms of the evidence being "harmless" because of the existence of other "independent" evidence. Under a fourth amendment analysis, we ask whether an illegal stop or arrest occurred and, if so, what evidence was obtained through the violation. If, as Rodriguez contends on appeal, additional evidence adduced at trial was the fruit of an illegal stop, then it presumably should have been excluded at trial. On the other hand, if the additional evidence inevitably would have been discovered regardless of the stop, then the evidence need not be excluded. *See Nix v. Williams,* 467 U.S. 431, 441–48, 104 S.Ct. 2501, 2507–11, 81 L.Ed.2d 377 (1984). The government, of course, bears the burden of showing by a preponderance of the evidence that the additional evidence would inevitably have been discovered. *Id.* We agree that Rodriguez's identity certainly would have been discovered apart from the stop: the telephone number alone would have led to his identification, and the DEA inevitably would have followed that lead, together with the multiple recordings of phone calls, the identification by Sanchez and the hotel registration, to identify Rodriguez.

B. *Possession with Intent to Distribute*

Rodriguez argues that insufficient evidence supports his conviction for possession of cocaine with intent to distribute. We must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

■■■ No evidence showed that Rodriguez ever was in actual possession of the cocaine involved in the indictment. The government argued the case to the jury and defends the verdict on appeal under the theories of constructive possession or of aiding and abetting. (The government apparently declined to pursue a conviction based on co-conspirator liability as outlined in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), despite the fact that Rodriguez was convicted of the conspiracy charge here.) This circuit recognizes the theory of constructive possession, *see United States v. Manzella,* 791 F.2d 1263, 1266 (7th Cir.1986); *United States v. Shackleford,* 738 F.2d 776, 784–85 (7th Cir.1984), and requires that the defendant have "dominion and control" over the object, that is, the power to possess it. *Shackleford,* 738 F.2d at 785. Constructive possession may be shown by direct or circumstantial evidence, but "[m]ere association with those who possess the drugs is not good enough," *Manzella,* 791 F.2d at 1266, nor is it sufficient that a defendant played "the role of a finder, a broker, [or] a bringer together of seller and buyer," *id.* In order to be convicted for aiding and abetting, Rodriguez must have committed an act that encouraged or assisted another in committing the offense, and he must have had the intent to aid in its commission. *See United States v. Greer,* 467 F.2d 1064, 1069 (7th Cir.1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); *see also United States v. Gabriel,* 810 F.2d 627, 636 (7th Cir.1987). Proof of intent may be inferred from the circumstances. *Gabriel,* 810 F.2d at 636.

■■■ Rodriguez contends that the government failed to show either that he had any actual control over the contraband or that a working relationship existed between him and the Zambrana organization such that he would assure delivery of the contra-

band. Rodriguez also denies that the evidence supports a guilty verdict based on aiding and abetting others in possessing contraband with intent to distribute. Only conjecture, according to Rodriguez, permitted the jury to find that he had the intent necessary to support aiding and abetting liability.

We agree with the government that adequate evidence showed that Rodriguez did control the delivery of cocaine for the conspiracy, that Rodriguez had the intent to aid the conspiracy in possessing and distributing cocaine and that he acted in accordance with that intent. With regard to constructive possession, the evidence permits the conclusion that the Zambrana family made several telephone calls to Rodriguez's phone in Miami, speaking with Rodriguez to organize trips to Miami to purchase and pick up cocaine. Two associates of the Zambranas, one of whom Rodriguez knew, went to Miami after these calls and returned with nearly six kilograms of cocaine. The two registered under Rodriguez's name at a Florida hotel. When viewed in combination with Rodriguez's subsequent visit to Jay Zambrana and Sanchez in Indiana and Sanchez's testimony that two packages of cocaine were left in his garage after Jay Zambrana and Rodriguez visited him, this evidence supports the conclusion that Rodriguez had a working relationship with the Zambranas sufficient to support a verdict based on constructive possession. With regard to aiding and abetting, the evidence permits the conclusion that Rodriguez associated himself with the Zambrana organization, intentionally assisting in the pickup and delivery of the April shipment of cocaine. Rodriguez's telephone conversations and meetings with coconspirators permit an inference that he shared the criminal intent of other members of the conspiracy to possess cocaine with intent to distribute.

██ We must comment here on a serious confusion in the record of this case, confusion that the government could eliminate by exercising adequate care. This confusion derives from a scatter-gun approach to the question of Rodriguez's liability for possession despite the lack of evidence of actual possession. The government had at least three potential theories: constructive possession, aiding and abetting and vicarious co-conspirator liability. The government argued the vicarious conspiracy liability ground to the district court after the verdict and to us in its brief on appeal. However, the government explicitly conceded at oral argument that it never offered (and the district court never gave) a *Pinkerton* co-conspirator instruction. This precludes the government from defending the verdict on this ground.[5]

We cannot accept, therefore, the district court's conclusion that the verdict on Count IV is proper because "all acts done in furtherance of [the charged] conspiracy, including Count IV, are attributable to defendant." HCR 85–77(9), mem. op. at 10 (May 6, 1986) (order denying new trial). This circuit has cautioned that *Pinkerton* liability is powerfully broad and that the jury must be carefully instructed on the requirements of vicarious liability for any verdict to stand on that ground. *See, e.g., Manzella,* 791 F.2d at 1267–69. Here there was no *Pinkerton* instruction. Only because the evidence adequately establishes constructive possession and aiding and abetting do we affirm the conviction on Count IV.

### C. Other Acts Evidence

██ Rodriguez challenges the admission into evidence of the fact that in February 1985 he and his co-indictee Lonzo were riding together in a car that was involved in an accident. Rodriguez suggests that this evidence of "extra-indictment" conduct was admitted solely to link him to a narcotics trafficker and was without probative value. The government contends that this evidence was properly admitted pursuant to Federal Rule of Evidence 404(b).[6] The

---

5. It is improper for any attorney to present an argument in its brief to this court and then, at oral argument, explicitly disavow reliance on this argument. We are especially disturbed at such wavering by a federal prosecutor in a criminal appeal.

6. Rule 404(b) provides in pertinent part:

government contends that evidence that Rodriguez and Lonzo knew each other in February 1985 is relevant to the question of Rodriguez's knowledge of the conspiracy and the co-conspirators.

We agree with the government that this evidence was admissible. Proof of an automobile accident is not proof of a prior crime or even a bad act. It is far from clear that this evidence tended to show Rodriguez's character or any propensity to take action in conformity with it. The relevance to the conspiracy charge, however, is clear—knowledge of a co-conspirator is relevant. And the prejudicial effect does not seem to outweigh the probative value. We find that the district court did not abuse its discretion in admitting this evidence.

### III.

We therefore conclude that the convictions are

AFFIRMED.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Fed.R.Evid. 404(b).