**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Roy W. NAFZGER, Defendant– Appellant.**

**No. 91–3292.**

United States Court of Appeals, Seventh Circuit.

Argued March 3, 1992.

Decided Sept. 9, 1992.

Rehearing Denied Oct. 15, 1992.

Grant C. Johnson, Asst. U.S. Atty. (argued), Madison, Wis., for plaintiff-appellee.

Ralph A. Kalal (argued), Kalal & Habermehl, Madison, Wis., for defendant-appellant.

Before CUMMINGS, CUDAHY, and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Roy Nafzger pled guilty to one count of a three-count indictment charging him with knowingly possessing stolen motor vehicles in interstate commerce. *See* 18 U.S.C. § 2313. As part of his conditional plea agreement, he reserved the right to challenge the district court's denial of his motions to suppress statements made to police and the stolen vehicles uncovered by a warrantless search of his property. *See* Fed. R.Crim.P. 11(a)(2). This appeal concerns the propriety of the court's denial of the suppression motions and the court's two-point enhancement of the defendant's offense level under the Sentencing Guidelines for "more than minimal planning." U.S.S.G. § 2B1.2(b)(4)(B). We affirm the denial of the motions to suppress and remand for reconsideration of the enhancement of his sentence for more than minimal planning.

## I. BACKGROUND

On October 18, 1990 a combined FBI-state investigation of an interstate car theft ring came to a head. Early that morning FBI agent Thomas Marquardt, assisted by police officers from Dane County, Wisconsin, arrested Anthony Pratt, one of the suspected ringleaders, in Madison, Wisconsin. Pratt waived his *Miranda* rights and told Marquardt that the defendant, Roy Nafzger, and his brother, Ralph Nafzger,[1] were in possession of stolen vehicles. Marquardt relayed this information to a "command post" established at the Dane County Sheriff's office and manned by the FBI agents and officers from the Dane County Sheriff's Department who were assigned to and coordinating the investigation.

At approximately 1:00 p.m. on that same day, FBI agents and Dane County officers met for a briefing at a truck stop restaurant called the Loafing Shed, in the town of Juda, located in Green County, Wisconsin.

Officers from the Green County Sheriff's Department were also present at the briefing, as they were charged with providing security for this phase of the investigation. One of these officers was Detective Terry Argue, a nineteen-year veteran of the Green County police force. At the briefing, Argue and the other officers were informed that Roy and Ralph Nafzger were suspected of being involved in a stolen car ring. They were also advised that stolen vehicles might be stored at the Nafzgers' respective farms, and that a search warrant had been issued for Ralph Nafzger's farm. Argue was then assigned to provide security for the FBI agents and Dane County officers as they searched Ralph Nafzger's farm.

While this search was taking place, Argue observed Roy drive past Ralph Nafzger's farm in a pick-up truck. Knowing that he was a suspect in the investigation, Argue jumped into his squad car, pursued Roy and apprehended him by directing him to pull over to the side of the road. He instructed Roy to place his hands outside the window and exit the truck. After the defendant complied, Argue frisked him for weapons. Very shortly thereafter, while the frisking was still going on, a separate group of officers, who had been assigned to search for and question Roy concerning the location of the stolen vehicles, appeared at the scene of the stop in an unmarked car. These officers had been looking for Roy at his farm when they saw him drive past. They gave chase, but before they could apprehend the defendant, Argue had him in custody. Argue told the defendant that the officers wanted to talk to him, and the officers invited Roy to sit in their vehicle.

Once seated, the officers told Roy that they believed he might be in possession of stolen vehicles and began asking him some general questions. He responded by saying that he thought he should talk to his attorney before he said anything.[2] At this

---

**1.** To avoid confusion, this opinion will refer to Ralph Nafzger by his full name and Roy Nafzger as either "the defendant" or "Roy."

**2.** The issue of whether the officers violated Roy's rights by speaking to him after he requested a lawyer is not before us on appeal. The district court found his rights were not violated, and he does not now contest that finding.

point the officers agreed to stop asking questions, but stated that they would like permission to search the premises at his farm. Roy initially refused to consent, but after the officers contacted the "command post" with directions to prepare an application for a search warrant for the defendant's farm he said, "I want to cooperate," and signed a form consenting to the search of his property. Thereafter, he advised the officers that they would find three stolen vehicles at his farm—a Corvette and two pick-up trucks. At about the same time, Ralph Nafzger advised another group of officers at his farm that stolen vehicles were being stored at Roy's farm.

The officers found the vehicles tucked away in buildings at Roy's farm, and subsequently Roy was indicted and charged with three counts of possession of a stolen vehicle in interstate commerce. 18 U.S.C. § 2313. He moved to suppress both the statements he made to the officers and the discovery of the stolen vehicles on numerous grounds, claiming that Argue acted unlawfully in detaining him for an investigative stop, that his consent to the search was the fruit of an unlawful stop, and further that his consent was neither knowingly nor voluntarily given. He also asserted that his consent was the result of a *Miranda* violation, and was the product of an unlawful arrest. The district court, after conducting an evidentiary hearing, accepted the magistrate judge's recommendation to deny the motions to suppress. The court found that Argue had a sufficient basis to detain the defendant and that the consent to the farm search was properly obtained. Roy pled guilty to Count I of the indictment and reserved the right to challenge the denial of his suppression motions.

Applying the Sentencing Guidelines, the court categorized the defendant as belonging in Criminal History Category I, and proceeded to calculate his offense level, first considering the monetary value of the loss suffered by the vehicle owners. U.S.S.G. §§ 2B1.2(a) and (b)(1)(H). Under §§ 1B1.3(a)(2) and 3D1.2(d), this calculation included the value of the vehicles mentioned in all three counts, not just the one to which Roy pled guilty, as the possession of these vehicles was "relevant conduct" for sentencing purposes. The vehicles found at Roy's farm were worth a total of $58,668, adding seven points to the Base Offense Level, and bringing the total offense level to 11. The court then added two points under §§ 1B1.1 and 2B1.2(b)(4)(B) because the offense involved "more than minimal planning." Though the defendant objected to this enhancement, the district court concluded that the defendant's possession of three vehicles constituted "repeated acts" and inferred that because he possessed them at the time of his arrest he had probably harbored them for some prior period, and thus the acts were committed "over [a] period of time," as required by application note 1(f) to § 1B1.1.

Finally, the court reduced the Base Offense Level by two for Roy's acceptance of responsibility. U.S.S.G. § 3E1.1. Having finished its additions and subtractions, the court sentenced the defendant to six months in prison, followed by three years of supervised release. The court also ordered him to pay $30,602 in restitution to State Farm Insurance, a fine of $5,000, and a $50 criminal assessment penalty.

## II. ISSUES

There are two issues in this case: (1) Did Argue have sufficient information communicated to him by those with a reasonable suspicion that the defendant had either committed or was about to commit a crime to allow him to perform a *Terry* stop on the defendant? and (2) Was the enhancement for "more than minimal planning" improper in the sense that it led to "double counting" of the defendant's possession of the vehicles mentioned in the dismissed counts of the indictment? Or, alternatively, did the court lack a sufficient basis to find that Roy's possession of the vehicles amounted to "repeated acts over a period of time," and thus required more than minimal planning? U.S.S.G. § 1B1.1, application note 1(f).

## III. ANALYSIS

### A. *Motion to Suppress*

The defendant's first claim is that the district court should have granted his mo-

tion to suppress the statements he made to the officers after Argue stopped him.[3] He contends that Detective Argue did not have sufficient information on which to base a reasonable suspicion that Nafzger was involved in criminal activity, and thus Argue violated his Fourth Amendment rights when pulling him over for a *Terry* stop. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), held that police officers may make limited investigative stops of suspects on less than probable cause as long as they can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* at 21, 88 S.Ct. at 1879.

■■■ The officer involved in the stop need not personally be aware of all of the "specific and articulable" facts justifying the intrusion, however; it is sufficient that a law enforcement officer who is aware of such facts relay his or her reasonable suspicion to the officer effecting the stop, who may then rely on it. This "collective knowledge" concept was endorsed by the Supreme Court in *United States v. Hensley*, 469 U.S. 221, 232–33, 105 S.Ct. 675, 682–83, 83 L.Ed.2d 604 (1985). In *Hensley,* police officers in Kentucky stopped Hensley's automobile and uncovered weapons leading to his indictment. Hensley moved to suppress the weapons, contending that the officers had an insufficient basis for the *Terry* stop. The officers had acted in reliance on a flyer issued by Ohio police stating that Hensley was wanted for criminal investigation in connection with a felony committed in Cincinnati, Ohio—they had no personal knowledge of the evidence implicating him. Hensley argued that, since the stopping police had no personal knowledge of the evidence against him and did not know what facts had caused the Ohio police to issue the flyer, they did not have grounds for a reasonable suspicion, and the *Terry* stop was unjustified. The Supreme Court held that a stop based on such a flyer was permissible so long as the officers who issued the bulletin themselves

had an adequate basis for effecting a stop; if so, then the stopping officers would be justified in relying on the bulletin even if they were unaware of the underlying facts:

> [W]hen evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance.

\*　　\*　　\*　　\*　　\*　　\*

> We conclude that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, the reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. If the flyer has been issued in the absence of reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.

*Id.* 469 U.S. at 231–32, 105 S.Ct. at 681–82.

The principle behind *Hensley* is that law enforcement officers in diverse jurisdictions must be allowed to rely on information relayed from officers and/or law enforcement agencies in different localities in order that they might coordinate their investigations, pool information, and apprehend fleeing suspects in today's mobile society.

> In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act

---

**3.** Nafzger does not argue on appeal that the vehicles found during the search of his farm should also have been suppressed.

promptly in reliance on information from another jurisdiction.

\*　\*　\*　\*　\*　\*

The law enforcement interests promoted by allowing one department to make investigatory stops based upon another department's bulletins or flyers are considerable, while the intrusion on personal security is minimal. The same interests that weigh in favor of permitting police to make a *Terry* stop to investigate a past crime ... support permitting police in other jurisdictions to rely on flyers or bulletins in making stops to investigate past crimes.

*Id.* at 231–32, 105 S.Ct. at 681–82. The Fourth Amendment rights of the defendant are adequately protected by the requirement that the officers issuing the order or request have an adequate basis for doing so, such that if they were present at the scene, they could justifiably stop or arrest the suspect. *Id.* at 233, 105 S.Ct. at 682. By the same token, if the officers issuing the bulletin did not have a sufficient factual basis for requesting a stop or arrest, then the fruits of the stop or arrest could be suppressed. *Id.*

As articulated by this court, the *Hensley* collective knowledge doctrine requires: (1) that the officer effecting the stop act in objective reliance on the information received; (2) that the law enforcement officer providing the information had a reasonable suspicion to justify the stop; and (3) that the stop conducted was no more intrusive than would have been permissible for the officer requesting it. *United States v. Wheeler*, 800 F.2d 100, 103 (7th Cir.1986). Further, the requesting officer's belief that there is sufficient evidence to detain a suspect must have been communicated to the officer performing the stop. *Id.* Of course, when officers are in communication with each other while working together at a scene, their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed (though of course the information actually possessed by the officers must be sufficient to justify the stop

or arrest). *United States v. Edwards*, 885 F.2d 377, 382 (7th Cir.1989); *United States v. Woods*, 544 F.2d 242, 260 (6th Cir.1976).

■ The defendant maintains that Detective Argue, who did not have personal knowledge of facts supporting the *Terry* stop of the defendant, also did not have a sufficient basis for the stop under the *Hensley* doctrine, and therefore the statements he made as a result of this stop should have been suppressed. More specifically, he contends that (1) the officers who informed Argue that the defendant was a suspect did not personally have sufficient information on which to base a *Terry* stop, and (2) even if the officers did have sufficient information, it was not adequately communicated to Argue.

### 1. Sufficient Information

As noted above, *Hensley* authorizes a stop based on information from another law enforcement officer or agency only when the officer relaying the information is able to satisfy the *Terry* "reasonable suspicion" standard. *Hensley*, 469 U.S. at 232–33, 105 S.Ct. at 682–83. In this case Argue received his information (that the defendant was suspected as being a member of the stolen car ring and probably had stolen cars at his residence) from the FBI and Dane County Sheriff's officers who directed the investigation of the ring and who conducted the briefing at the Loafing Shed restaurant on October 18, 1990. The record does not directly reveal the source of these officers' information, but it does reveal that officers at the investigation's command post in Dane County received specific information regarding the defendant from FBI agent Marquardt, who was a key member of the investigative team. Prior to the October 18 briefing, Marquardt had arranged for James Holpin, a former co-conspirator acting as a government informant, to purchase a stolen vehicle from Anthony Pratt, one of the ringleaders. Pratt took Holpin to the locations where the stolen vehicles were being stored. One of these places was Roy Nafzger's farm, where Holpin saw a Chevrolet pick-up truck which Marquardt later determined

had been stolen. R. 35, at 2–3. On the morning of October 18, 1990, Marquardt arrested Pratt, who waived his *Miranda* rights and told Marquardt that Roy Nafzger was in possession of stolen vehicles at his (Roy's) farm. Marquardt relayed this information by phone to the supervising FBI and Dane County officers at the investigation's command post. Around 1:00 p.m. that same afternoon, FBI and Dane County officers who were members of the investigative team briefed Argue and others at the Loafing Shed restaurant.

Based on these facts, Marquardt certainly had sufficient information to subject the defendant to a *Terry* stop. As the Supreme Court observed in. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981), the essence of the *Terry* standard is that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Marquardt knew that stolen vehicles had been observed on the defendant's farm and that the. head of the crime ring had named the defendant as a participant. Thus, Roy's argument that Marquardt did not have sufficient information to subject him to a *Terry* stop fails. *See United States v. Randall*, 947 F.2d 1314, 1318 (7th Cir.1991) ("Probable cause means 'a fair probability that contraband or evidence of the crime will be found' and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause."), quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), and citing *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The defendant next focuses on the question of whether Marquardt's well-grounded suspicion was adequately communicated to Argue.

### 2. Communication of the Suspicion and "Collective Knowledge"

Roy's main assault on Argue's justification for the stop is that, even if Marquardt had a reasonable suspicion that he was involved in the crime ring, this suspicion and its supporting facts were not adequately communicated to Argue. The district court rejected this argument, finding that since Argue was a member of the team investigating Nafzger, and had been advised at the briefing that Nafzger was a suspect, he could rely on both his personal knowledge and the team's collective knowledge as justification for the stop. *See Edwards*, 885 F.2d at 382. The defendant asserts that the court incorrectly applied *Edwards*, which he claims allows the knowledge of one officer to be imputed to another only where the two officers are: (1) working together, (2) at the same scene, and (3) are in communication with each other. *Id.* He maintains that neither Marquardt, nor the officers who had seen vehicles at his farm and questioned him at the stop, nor the officers who questioned Ralph Nafzger when he implicated Roy, meet this test: Marquardt and the officers at Roy's farm were neither at the same scene nor in communication with Argue, and the officers at Ralph Nafzger's farm were also not in communication with Argue.

The defendant, in an attempt to construe the law to his advantage, interprets the concept of collective knowledge or imputed knowledge among law enforcement officials far too narrowly. It is not unusual, much less improper, for the collective knowledge doctrine to be applied in cases such as this, where one police officer acts based on information provided by another officer who is not at the scene. The idea, explicitly approved in *Hensley*, is that when a court reviews a stop or arrest to see if reasonable suspicion or probable cause was present, it should examine the information known to both the officer giving the direction and the officer carrying out the *Terry* stop or arrest to determine whether, between the two, there was an adequate factual basis for the action. *See United States v. Greer*, 939 F.2d 1076, 1092 (5th Cir.1991) ("Moreover, the determination of reasonable suspicion involves the totality of the circumstances, including the collective knowledge of all [the] officers in assessing the facts.") (internal quotation marks omitted); *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir.1989) ("probable

cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest.") If the officer issuing the flyer or bulletin concludes that the facts he is aware of authorize a stop or arrest and relays that conclusion to another officer, that officer may rely on the conclusion, regardless of whether he knows the supporting facts. "[A]lthough the officer who issues a wanted bulletin must have a reasonable suspicion sufficient to justify a stop, the officer who acts in reliance on the bulletin is not required to have personal knowledge of the evidence creating a reasonable suspicion." *Hensley*, 469 U.S. at 231, 105 S.Ct. at 681, discussing *United States v. Robinson*, 536 F.2d 1298, 1300 (9th Cir.1976).

> As this court recently stated,
> The police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency. In that case, the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause.

*Randall*, 947 F.2d at 1319, quoting *United States v. Valencia*, 913 F.2d 378, 383 (7th Cir.1990). The law enforcement officer making the arrest or stop acts within the law so long as an objective interpretation of the flyer or bulletin would lead him or her to believe that the stop or arrest was permissible.[4] *Hensley*, 469 U.S. at 232, 105 S.Ct. at 682; *United States v. Longmire*, 761 F.2d 411, 416 (7th Cir.1985).

This court has not wavered in its application of the collective knowledge doctrine. For example, a stop was justified based on collective knowledge when the stopping officer relied on a radio bulletin describing the suspect, his car, and the alleged crime. *Randall*, 947 F.2d at 1316–19. *Edwards* also involved a radio communication where one officer told others that "the meet went

down," meaning a drug deal had taken place. This helped justify a stop of one of the deal's participants. 885 F.2d at 382. In another case, we approved a stop based on a "flash message"—information from a complainant or witness transmitted by an officer to other officers in the area—even though the arresting officer did not have personal knowledge of the facts creating the reasonable suspicion. *Longmire*, 761 F.2d at 413–15. Similarly, we held that an off-duty officer's call for assistance in preventing armed members of a motorcycle club from inciting a rumble with members of a rival motorcycle club and his pointing out of dangerous individuals to other officers justified a stop and frisk of one of the suspects. *Wheeler*, 800 F.2d at 102–04. The evidence found in the stop and frisk was held admissible because the officers reasonably relied on the request for assistance and directions of an off-duty officer who had a reasonable suspicion that certain gang members were likely to commit a crime of violence. *Id.*

We applied the collective knowledge concept in circumstances similar to this case in *United States v. Rodriguez*, 831 F.2d 162 (7th Cir.1987). In *Rodriguez* the Drug Enforcement Administration (DEA) had combined with several local law enforcement agencies to conduct a large scale drug investigation. Surveillance and wiretaps led the DEA to suspect Rodriguez as a member of a drug conspiracy, and the DEA decided to stop Rodriguez's car for a brief investigation. The DEA requested state law enforcement officials to make the actual stop, and they did. Rodriguez claimed that the stop violated the Fourth Amendment, arguing that the DEA agent who requested the stop lacked a reasonable and articulable suspicion of him, and that even if adequate suspicion existed, the state officer who stopped him had inadequate collective knowledge to authorize the stop. *Id.* at 165.

After finding that the DEA agent had a reasonable suspicion of the defendant, we

---

**4.** Moreover, if an objective reading of the flyer or bulletin would lead a reasonable officer to believe a stop or arrest was allowed, then he or she would likely have a good faith defense to any civil suit based on the stop or arrest. *Hensley*, 469 U.S. at 232–33, 105 S.Ct. at 682–83.

addressed the collective knowledge issue, holding that the stop was allowable.

> The requesting DEA agent had good grounds for articulable suspicion and the detaining officer had a reasonable basis for believing the request to be well-founded—even though she did not personally know the facts giving rise to the suspicion. Unlike *Hensley*, here the automobile to be stopped with its occupant was pointed out specifically by the requesting officer, and the detaining officer knew the requesting officer was coordinating a large investigation with local agencies. The state trooper was therefore merely acting as an "extension" or agent of the DEA and could act on the DEA agent's suspicions.

*Id.* at 166. Like the state trooper in *Rodriguez*, Argue knew that the state and federal officials who briefed him were conducting a large interstate investigation, and these officials specifically mentioned Roy Nafzger as a suspect. He was entitled to rely on their collective knowledge which, as we shall see, included Marquardt's knowledge that grounds existed for stopping the defendant.

The only possible distinction between *Rodriguez* and the instant case is that the requesting DEA officer in *Rodriguez* apparently had direct knowledge of the facts supporting his suspicion, whereas the source of the briefing officials' suspicion here is not explicitly revealed in the record. This arguable distinction is inconsequential, however, as agent Marquardt was an active member of the joint FBI-state investigative team, and he communicated the information he received from Pratt to the command post well before the briefing on the afternoon of October 18.[5] Because the command post, in turn, was in radio contact with all units involved in the investigation,[6] it is reasonable to impute Marquardt's knowledge to the officials who instructed Argue at the briefing, even in the absence of specific testimony demonstrating that the command post notified the briefing officers of Marquardt's suspicion. *Cf. Randall*, 947 F.2d at 1316–19 (*Terry* stop justified where officer with probable cause related his suspicion to Police Department, which radioed this information to a patrolman, who in turn directed other officers to detain the suspect). Both Marquardt and the briefing officers were part of a coordinated investigation, and all were in close communication with the same command post, the investigation's information center. Thus, since Marquardt had *grounds to suspect* Roy and this suspicion was presumably relayed, via the command post, to the briefing officials, who then relayed it to Argue, his stop of the defendant did not violate the Fourth Amendment. *Cf. United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir.1990) ("when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause.").

Our holding is consistent with *Edwards*. The court there spoke of imputing knowledge between officers "working together on the same scene and in communication with each other." 885 F.2d at 382 (internal quotation marks omitted). The officers here clearly were working together and in

---

**5.** Marquardt's questioning of Pratt ended around 9:30 a.m. on the morning of the 18th, at which time he notified the command post of Pratt's statements, including his naming the defendant as a participant in the theft ring. The briefing did not begin until *several hours later*, around 1:00 p.m.

**6.** Special Agent Marquardt described the role of the command post in directing and coordinating the investigation as follows:

> The command post was set up at the Dane County Sheriff's Office. *They had radio contact with all of the units.* We were using Dane County Detectives' cars, *plus we had cellular phones in the Dane County cars, so it*

> *allowed us to have better communications than we might normally have.*
>
> At the command post we had a supervisor from our office and Dane County Supervisors also and the purpose was if decisions were to be made, they'd be in a position to make them in one central location. We provided—we went to a telephone as I indicated, and provided to the command post information regarding individuals who Mr. Pratt had identified as having stolen vehicles, and additionally how many vehicles these individuals had, if they had multiple vehicles.

R. 37, Direct Examination of Thomas K. Marquardt, at 1–B–20, 21 (emphasis added).

communication with each other by means of the command post. Also, the "same scene" qualification need not be taken literally where, as here, the crime being investigated had several participants and covered a large area, and the investigation was making use of an established communication system. There is no reason to require Marquardt's presence at the scene of the stop. Where officers are capable of instant communication at any time, his presence should not make any difference, so long as his justified suspicion travelled through reliable channels—namely, through the command post officials coordinating the investigation—and eventually reached the briefing officials and then Argue. Further, the language in *Edwards* referring to officers at the same scene is quoted from the Sixth Circuit's opinion in *United States v. Woods*, 544 F.2d 242 (6th Cir.1976), which also stated that "when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest." *Id.* at 260. Thus it is the ability of the officers to communicate with each other that matters most, not whether the officers were physically at the same scene.

In sum, we are convinced that Marquardt had a reasonable and articulable basis for performing a *Terry* investigative stop on the defendant before the stop actually took place, satisfying the *Hensley* requirement that the requesting officer have a legitimate basis for the request. He relayed this information to the command post on the morning of October 18. Later that same day other members of the investigative team, who were also in communication with the command post, briefed Argue and others, stating that the defendant was a suspected member of the crime ring who could be storing stolen vehicles. Though the government failed to present evidence at the suppression hearing demonstrating that the briefing officials knew of what Marquardt had told the command post (either on that day or earlier, when an informant spotted a stolen truck at the defendant's farm), we hold that it is proper to impute Marquardt's knowledge to these officers who, like Marquardt, were in close communication with the command post, the "nerve center" of the investigation. Thus, since the officers who briefed Argue received their information from another officer with an adequate basis for subjecting the defendant to a stop, Argue had no reason to doubt that there were sufficient grounds for stopping the defendant, and his act was justified under *Hensley*.

■ We briefly address the defendant's other arguments regarding the stop. Initially he asserts that Argue's stop was improper because no one directly ordered him to initiate the stop—he simply did it because he knew that the defendant was a suspect. He cites no case law to support this proposition, and we reject the idea that the requesting officer must order another officer to make a stop or arrest before he or she can act.[7] Indeed, an officer who waited for an official order to act while a known suspect fled the scene, in spite of having sufficient information from a bulletin that the suspect was wanted, might well be subject to departmental discipline. The only relevant question is whether the officer performing the arrest or stop had sufficient *information* to justify the action, not whether there was a formal order to detain the suspect. *Wheeler*, 800 F.2d at 103. Argue received sufficient information at the briefing—he knew that officers who

---

**7.** We have previously upheld stops where the stopping officer never received a command or request to act. For example, in *Wheeler* the officer who suspected the defendant of criminal activity did not order the stopping officer to detain the defendant; he simply pointed at the defendant and told the stopping officer that the defendant was armed and dangerous. We held that this stop was justified under the collective knowledge doctrine. 800 F.2d at 102. Similarly, in *Longmire* we used the collective knowledge doctrine to uphold a stop where the stopping officers had not been ordered to detain the defendant, but were simply responding to a radio bulletin describing his car and saying he was a suspect in an aggravated assault. 761 F.2d at 414.

investigated the activities of the crime ring suspected the defendant was involved and that the crime was continuing. This was enough; they need not have added a specific request or command before Argue could act. *Cf. United States v. Taylor,* 857 F.2d 210, 213 (4th Cir.1988) ("The Fourth Amendment does not require police officers 'to simply shrug their shoulders and allow a crime to occur or a criminal to escape.' "), quoting *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

■ The defendant also argues that the stop was illegal because Argue did not know the source or reliability of the information that led the briefing team to suspect him. *Hensley* does not require him to; it only requires that an objective evaluation of the information would allow a reasonable officer to believe that the action taken was appropriate. 469 U.S. at 232–33, 105 S.Ct. at 682–83. It is enough that he knew the briefing officials were part of a sizeable investigative team and that stolen vehicles had been seen at Roy and Ralph Nafzger's farms. *See United States v. Celio,* 945 F.2d 180, 183–84 (7th Cir.1991) ("generalized statement [from requesting officer,] without the factual details in which the suspicion was rooted", plus a specific description of the vehicle and its suspected contents justified search); *Longmire,* 761 F.2d at 415 (rejecting contention that officers conducting *Terry* stop based on radio bulletin had to know facts supporting the bulletin); *Rodriguez, supra.* One of the policies animating *Hensley* and the collective knowledge doctrine is that law enforcement officials must be allowed to rely on information received from other officers or law enforcement agencies and to presume such information is accurate. *See Hensley,* 469 U.S. at 231–33, 105 S.Ct. at 681–83. To require more (i.e., that the stopping officers know all the facts supporting a suspicion) would place an impossible burden on officers and remove modern communication systems as a law enforcement tool.

## B. *Sentence Enhancement for "More Than Minimal Planning"*

■ To resolve the sentencing issue, we must first briefly review the steps leading to the sentence. Under Guideline § 2B1.2(a), the Base Offense Level for possession of stolen property is 4. The Base Offense Level may be increased when any of the Specific Offense Characteristics set forth in § 2B1.2(b)(1) through (5) are present. For example, where the value of the stolen property exceeds $100, the offense level is increased by the amount designated in the table in § 2B1.1. U.S.S.G. § 2B1.2(b)(1). In calculating the value of the stolen property here for sentencing purposes, the court properly took into account the value of all three of the stolen vehicles found at the defendant's farm, though he had only pled guilty to possessing one of them. This was required by § 1B1.3(a)(2), which includes as "relevant conduct" for sentencing purposes "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." The three vehicles here were worth a total of $58,668, and, following the table in § 2B1.1, the court increased the defendant's offense level to 11.

Next, the court added two points to the offense level based on its finding that the defendant had engaged in more than minimal planning. U.S.S.G. § 2B1.2(b)(4)(B). An enhancement for more than minimal planning is appropriate where the offense involves "repeated acts over a period of time." U.S.S.G. § 1B1.1, application note 1(f). The court here found that the defendant committed "repeated acts" because he possessed three separate vehicles. It also found that these acts took place "over time" because the defendant possessed them on October 18, 1990, and therefore must also have possessed all three vehicles prior to that date. The two-point enhancement pushed the defendant's offense level to 13, but the court then subtracted two points for acceptance of responsibility, bringing the final level back to 11.

The defendant challenges the district court's application of the Sentencing Guide-

lines, contending that the two-point increase for more than minimal planning amounted to impermissible "double counting," *see United States v. Werlinger*, 894 F.2d 1015, 1017–18 (8th Cir.1990), since his possession of these vehicles had been considered as part of the "relevant conduct" determining his offense level. U.S.S.G. § 1B1.3(a)(2). He also argues that his possession of three vehicles on October 18, 1990 did not justify the court's inference that he had acquired these vehicles through "repeated acts over a period of time." "We will affirm the district court if it correctly applied the Guidelines to findings of fact that do not leave us 'with the definite and firm conviction that a mistake was made.'" *United States v. Jordan*, 890 F.2d 968, 972 (7th Cir.1989), quoting *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989).

The "double counting" argument was recently rejected by the Eighth Circuit, and we agree with that court's analysis. In *United States v. Wilson*, 955 F.2d 547 (8th Cir.1992), the defendants made the same argument as Nafzger, maintaining that an enhancement for more than minimal planning was improper where the court had already increased their offense level based on the combined value of the goods they had stolen. The court disagreed, recognizing that these two enhancements address different aspects of the offense, and are not mutually exclusive.

> For property crimes, Chapter 2B of the guidelines defines the severity of the offense in part by the dollar amount of property stolen. Thus, at the time in question, the base offense level was 13 for a conspiracy to deal in $475,000 worth of stolen property, even if the conspiracy involved only one overt act. However, that base offense level was subject to adjustments reflecting other offense characteristics; the more-than-minimal-planning adjustment increases

the punishment for repeated criminal acts, regardless of the amount stolen.

*Id.* at 550. Thus, the "double counting" claim fails.

 The defendant's other argument fares better. According to Guideline § 1B1.1, application note 1(f), more than minimal planning "is deemed present in any case involving repeated acts over a period of time." [8] At sentencing, the court inferred that because the defendant had all three vehicles in his possession on October 18, 1990, he must also have possessed them before that date, meaning he had committed his crime over a period of time. This inference (that the vehicles were possessed prior to October 18) is certainly questionable, and quite possibly unjustified or unsupportable on the state of the record before us; both the indictment and the presentence report referred to possession on that date, not before. In addition, the court inferred that the defendant had committed repeated acts simply because he possessed three vehicles, without delineating whether these vehicles were obtained on one occasion or on several occasions. *Compare United States v. Cianscewski*, 894 F.2d 74 (3d Cir.1990) (more-than-minimal-planning enhancement proper where defendant had sold stolen checks on three separate occasions over a three-week period). It may very well be that the defendant did possess these vehicles over time and also acquired them on separate occasions, but the record before us fails to set forth information sufficient to enable us to determine whether the defendant engaged in "repeated acts" or whether these acts (receiving and possessing the stolen vehicles) took place "over a period of time." We therefore remand this case to the district court so that it may develop a more thorough and complete record and explicitly delineate its reasons as to why the more-than-minimal-planning enhancement is or is not justified in this case.

---

**8.** It also is present where there has been "more planning than is typical" or when "significant affirmative steps were taken to conceal the offense," but the enhancement here was not based on either of these. U.S.S.G. § 1B1.1, application note 1(f); *see generally United States v. Maciaga*, 965 F.2d 404 (7th Cir.1992) (discussing all three brands of more than minimal planning).

## IV. CONCLUSION

Detective Argue's stop of the defendant's vehicle, based as it was upon information from officials who had a reasonable suspicion that the defendant was committing or had committed a crime was permissible, and the court's denial of his motion to suppress statements obtained after the stop was proper. As to the sentence, the court correctly found that the defendant's Base Offense Level could be increased both for the monetary value of the goods involved and for more than minimal planning, and that this did not amount to "double counting." The enhancement for more than minimal planning, however, was grounded on less than complete information, and we therefore remand for a reconsideration of the enhancement and, if necessary, resentencing based on the defendant's new offense level.

AFFIRMED in part, REVERSED in part, and REMANDED.