UNITED STATES of America, Plaintiff,

v.

**Oge UKOHA, Clement Ugo Ezekwemba, Amobi Obioha, and Rosalyn Butler, Defendants.**

No. 98–80027.

United States District Court,
E.D. Michigan,
Southern Division.

July 7, 1998.

914

Ronald Waterstreet, Asst. U.S. Attorney, Detroit, MI, for Plaintiff.

Randall P. Upshaw, Lathrup Village, MI, for Defendant Ezekwemba.

Sue E. Radulovich, Grosse Pte., MI, for Defendant Ukoha.

Judith S. Gracey, Lathrup Village, MI, for Defendant Obioha.

Cyril C. Hall, Pontiac, MI, for Defendant Butler.

### OPINION AND ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

FEIKENS, District Judge.

**I. INTRODUCTION**

On January 27, 1998, defendants Oge Ukoha, Clement Ugo Ezekwemba, Amobi Obioha, and Rosalyn Butler were each indicted on two Counts: Conspiracy to Distribute Cocaine in violation of 21 U.S.C. § 846, and Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. § 841.

Defendant Ukoha individually, and defendants Obioha, Ezekwemba, and Butler collectively now move this court to rule (1) that their arrests were illegal because stops by law enforcement officers of the vehicles they occupied were not supported by probable cause; (2) that searches of the vehicles by law enforcement officers were conducted without probable cause; (3) that law enforcement officers did not obtain search warrants or valid consents to search the vehicles; (4)

that any alleged consent to searches of the vehicles was tainted by police illegality; (5) that defendants' arrests were products of unlawful stops and searches; and (6) that defendants' post-arrest statements are fruits of unlawful arrests, and all evidence obtained from the illegal searches of the vehicles and illegal arrests of the defendants should be suppressed.

## II. BACKGROUND

On January 9, 1998, Federal Task Force Agents, working with the FBI, monitored passenger traffic at the Detroit Greyhound Bus Station, and looked for drug traffickers. At approximately 8:45 p.m. agents observed defendant Oge Ukoha (Ukoha) exit an inbound bus from Chicago, IL, carrying a blue nylon duffle bag. Agent Burns [1] of the FBI anti-drug task force and another agent approached Ukoha, identified themselves, explained that they were involved in the investigation of transportation of drugs and drug money by bus, and interrogated him. By questioning Ukoha, the agents discovered that he had traveled from Texas to Chicago and then to Detroit (a two day trip). Ukoha's bus ticket and identification card listed 1201 Wilcrest, #189, Houston, TX as his address.

When the agents questioned Ukoha as to the purpose of his trip, he stated he was traveling to the Detroit area, for one day, to visit a friend named "Sam," and that. he planned to return home to Texas after this short visit. The agents state that Ukoha consented to a search of his belongings, which revealed that his duffle bag contained only a bathroom bag, two accounting books, and a leather jacket. When they dismissed him, they observed him enter a cab at approximately 9:00 p.m. They conducted a Law Enforcement Information Network check, and discovered Ukoha had been convicted of possession of marijuana in Houston, in November, 1996. They noted too that after such a long trip for a planned short visit, Ukoha's friend Sam did not meet him at the bus station. Consequently, when he took a cab, the agents tailed it. The cab arrived at Marvin's Gardens Inn, in Southfield, MI, at approximately 9:30 p.m. The inn's employees informed Agent Burns that Ukoha registered for one night, that he told inn employees that two people would occupy his room, and that he paid for his room in cash. They also informed Agent Burns that Ukoha registered his home address as 7350 Regency Square Court, Houston, TX, not the address on his Texas identification card, and that Ukoha occupied room number 276. Drawing upon their law enforcement experience, the agents' suspicions grew as to Ukoha's probable involvement in drug trafficking. They therefore set up surveillance on his hotel room.

Agents also observed defendants Butler (as passenger) and Ezekwemba (as driver) arrive at the Marvin's Gardens Inn, in a cab, at approximately 11:30 a.m. on January 10, 1998. As they exited the cab, agents observed that Butler carried a black leather purse. Butler and Ezekwemba went to a side door of the inn together where they were met by Ukoha. Approximately twenty minutes later, Butler and Ezekwemba exited the inn through the same side door. Agents noted that in addition to her purse, Butler now carried a white plastic bag. She entered the rear of the cab, Ezekwemba entered the driver's seat, and they departed. The agents conducting surveillance at the inn had other agents follow the cab.

At approximately 12:26 p.m. the same day, agents of the FBI anti-drug task force remaining at the inn observed Ukoha exit the side door of the inn carrying the blue duffle bag and a black garment bag. Ukoha walked over to the area outside the inn's lobby, and waited. At approximately 12:30 p.m. they observed Obioha drive up to the inn in a Ford Escort (Escort). Ukoha placed the blue duffle bag and the black garment bag in the back seat of the Escort. He then entered the front passenger seat, and he and Obioha departed in the Escort. After Ukoha and Obioha left the inn, Agent Burns contacted local police in Southfield and told them the agents believed the occupants of the Escort were involved in drug distribution. He asked the Southfield police to make an investigatory stop of the Escort. During the time

---

1. Mario Burns is a Michigan State Police Officer functioning as an FBI anti-drug task force agent.

agents followed the Escort, Obioha executed a U-turn the agents believe was intended to discover the presence of cars following him. At this time Agent Burns observed that Obioha operated the Escort with a cracked windshield, a violation of Michigan traffic laws.

After receiving radio information from their dispatcher that agents suspected that the occupants of the Escort were involved in drug trafficking, and after speaking in person with Agent Farago[2] of the FBI antidrug task force, Southfield Police Officers Toupin and MacDonald justifiably stopped the Escort for "an identification" at approximately 12:50 p.m. Toupin Testimony, Evidentiary Hearing of April 27, 1998, pp. 109–I, 111–I, 115–I. Officer Taylor of the Southfield police arrived after the stop, to assist Officers Toupin and MacDonald. Officer Toupin states they spoke with Obioha and obtained his consent to search the Escort. Obioha denied ownership of the blue duffle bag and the black garment bag. Officer Toupin states they then spoke with Ukoha and obtained his consent to search these bags. They discovered both a board game box containing 1 kg. of cocaine, and a white plastic bag containing $19,000.00 in U.S. currency, inside the blue duffle bag.

Meanwhile, Agent Heins[3] of the FBI antidrug task force contacted the Redford, MI police and told them the agents believed the occupants of the cab were engaged in drug trafficking. Agent Heins states he observed the cab make an illegal lane change. He asked the Redford police to make an investigatory stop of the cab. After receiving radio information from his dispatcher that agents suspected that the occupants of the cab were involved in drug trafficking, Redford Police Officer Gillman stopped the cab for identification at approximately 12:25 p.m. Gillman Testimony, Evidentiary Hearing of April 27, 1998, pp. 119–20–I. Redford Police Officer Hanish, driving a separate police cruiser, assisted Officer Gillman in making the stop. Based on the information they received from federal agents, Officers Gillman and Hanish had a justified suspicion that the cab's occu-

pants were involved in drug trafficking. The officers spoke with Ezekwemba and Butler, and had them exit the vehicle for a pat-down and check of their personal property for officer safety.

Butler volunteered, as an explanation for her presence in the cab, that she was simply a fare whom Ezekwemba picked up at the "Tel–12 Mall." She stated she had just finished shopping at the "Toys–R–Us" store there. Butler cooperated with Officers Gillman and Hanish, and was not placed under arrest. Officer Hanish asked if she would wait in the back of his police cruiser while the officers investigated. He asked to look in her bags, at which time he noted that Butler carried a purse and a white plastic bag containing a board game. He placed Butler's bags in the front of his police cruiser, and Butler entered the back of the cruiser to wait. He then went to assist Officer Gillman with Ezekwemba.

Officers Gillman and Hanish state that after exiting the cab, Ezekwemba became very upset about being stopped, and then became combative. He attempted to pull away from the officers and, during an ensuing struggle, pushed himself and Officer Hanish away from a police cruiser and into traffic. Officers Gillman and Hanish then tackled, arrested, and handcuffed him. Agent Heins assisted them. Because Ezekwemba fought with the officers, they charged him with resisting a police officer, and with assault and battery on a police officer. They took both Ezekwemba and Butler to the Redford police station. The officers state that Butler voluntarily accompanied them to the station.

While waiting at the Redford police station, Butler contacted her niece Carole Butler (Carole), and asked her to come to the station. Carole drove to the station in Butler's car. Upon Carole's arrival, Butler gave her the white bag containing the board game, and told her to take the bag with her. Carole placed the bag in Butler's car, and left it there. She traveled to Butler's home, at-

**2.** Donald Farago is a Taylor, MI Police Officer functioning as an FBI anti-drug task force agent.

**3.** Lawrence Heins is a Michigan State Police Officer functioning as an FBI anti-drug task force agent.

tended to duties there, and then returned to the police station in the same car.

After agents and Southfield police discovered cocaine in the board game possessed by Ukoha, they called and informed Redford police of their findings. Upon receiving this information, the Redford Police recalled that Butler possessed a board game, and they arrested her (she was still at their station). By this time, Carole had returned to the station. Redford police then searched Butler's car and seized the plastic bag containing the board game. They found that the board game concealed 1½ kg. of cocaine. The next morning, January 11, 1998, prior to beginning their shift, officers discovered another 1/2 kg. of cocaine in a cloth bag under the front passenger seat of the police car used to transport Butler the night before.

### III. ANALYSIS

The government's case depends upon two legal theories; (1) that the officers who stopped the vehicles did so lawfully, based on belief that the vehicle drivers committed traffic violations (the Escort's cracked windshield witnessed by Agent Burns, and the cab's illegal lane change witnessed by Agent Heins), and (2) that the police officers made valid *Terry* stops of the vehicles. I find the government's "traffic violation" assertions unpersuasive in view of the testimony of Officers Toupin and Gillman that they stopped the vehicles for identification purposes, not for traffic violations.

### A. *Terry* stops.

 Officers Toupin and Gillman made valid *Terry* stops of the vehicles at the requests of the agents. Fourth Amendment cases hold that a law enforcement officer may stop and detain a vehicle and its occupants at the request of another law enforcement officer, without knowledge of the specific facts upon which the requesting officer bases his or her suspicions of criminal activity. As long as the requesting officer has articulable facts that create a reasonable and particularized suspicion that criminal activity may be afoot, the detaining officer's *Terry* stop is valid under the Fourth Amendment. Under a totality of the circumstances analy-

sis, the detaining officer, as an extension or agent of the requesting officer, may lawfully act on the requesting officer's suspicions without possessing the same information the requesting officer has, provided the requesting officer has a reasonable suspicion based on articulable facts.

In a case in which officers of one police department stopped a suspect in reliance on a flyer, issued by another police department, that stated the suspect was wanted for investigation of a felony, the Supreme Court stated:

> We conclude that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, ... to pose questions to the person, or to detain the person briefly while attempting to obtain further information.

*United States v. Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (internal citations omitted). The Court in *Hensley* noted that if the flyer relied upon is issued "in the absence of a reasonable suspicion," a stop of a person in reliance upon the flyer "violates the Fourth Amendment." *Id.* at 232, 105 S.Ct. 675. But the Court then said:

> Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, *United States v. Robinson,* [536 F.2d 1298, 1299–1300 (9th Cir.1976) ], and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.

*Id.* at 233, 105 S.Ct. 675 (emphasis in original).

The United States Court of Appeals for the Seventh Circuit, citing *Hensley,* examined the issue of one officer relying on the *request* of another officer to make a "routine traffic stop" for the purpose of identifying the driver, and held:

> We do not believe that *Hensley* answers directly whether a police officer may rely

"objectively" on [another officer's] request for a "routine traffic stop" of a car for identification. Although the issue may therefore be novel, we think that, at least on the unusual facts of this case, the officer making the investigatory stop might reasonably rely on the request of another investigator. The requesting DEA agent had good grounds for articulable suspicion and *the detaining officer had a reasonable basis for believing the request to be well-founded—even though she did not personally know the facts giving rise to the suspicion.* Unlike *Hensley,* here the automobile to be stopped with its occupant was pointed out specifically by the requesting officer, and the detaining officer knew the requesting officer was coordinating a large investigation with local agencies. *The state trooper was therefore merely acting as an "extension" or agent of the DEA agent and she could act on the DEA agent's suspicions.*

*United States v. Rodriguez,* 831 F.2d 162, 166 (7th Cir.1987) (emphasis added).

The United States Court of Appeals for the D.C. Circuit, also citing *Hensley,* stated that officers may rely on a report from other officers, relayed by radio through a dispatcher, to justify their stop of a person or vehicle described in the report, even though the officers performing the stop could not vouch for the information in the report. *United States v. Cutchin,* 956 F.2d 1216, 1217–18 (D.C.Cir.1992). The court in *Cutchin* noted, however, that if the officer whose report the detaining officers relied upon does not have a reasonable suspicion, the detaining officer's stop will be illegal. *Id.* at 1218.

Thus, under *Hensley, Rodriguez,* and *Cutchin,* police officers may stop and detain a vehicle and its occupants at the request of other law enforcement officers or agents, without knowledge of the specific information on which the requesting officers base their suspicions. If the requesting officers have articulable facts that create a reasonable and particularized suspicion that criminal activity may be afoot, the "uninformed" officers' *Terry* stop is valid under the Fourth Amendment. The detaining officers, acting as an extension of the requesting officers, may act on their justified suspicions.

■ During his testimony, Officer Toupin stated that he received information via his dispatcher that federal agents suspected occupants of the Escort of drug trafficking. He also spoke directly with Agent Farago, who told Officer Toupin that:

[T]hey had been watching a guy that came in from Texas, and they believed he was trafficking narcotics, and he had spent the night in our city [Southfield, MI] and then left with some luggage the next morning. They said when he came in, he only came in with a small carrying bag, and he asked us if we would stop him for I.D. stop.

Toupin Testimony, Evidentiary Hearing of April 27, 1998, p. 104–I. In acting on the justified suspicions of the federal agents, Officer Toupin acted as their extension or agent. The agents specifically identified the Escort. Officer Toupin reasonably believed that their request to stop the Escort was well-founded, even though he did not personally know all the facts giving rise to their suspicions.

Similarly, during his testimony, Officer Gillman stated that he "was given information over our radio that there was a federal unit task force that needed help in stopping a vehicle that they believe was involved in narcotic trafficking." Gillman Testimony, Evidentiary Hearing of April 27, 1998, p. 119–I. The agents specifically identified the cab. Officer Gillman said he had no additional information when he stopped the cab. *Id.* He acted on the suspicions of the federal agents, as their extension or agent. He reasonably believed that the agents' request to stop the cab was well-founded, even though he did not personally know all the facts giving rise to the federal agents' suspicions.

Under *Hensley, Rodriguez,* and *Cutchin, supra,* Officers Toupin and Gillman reasonably relied on the reports and requests of federal agents to justify *Terry* stops of the Escort and cab. The information received from the agents was sufficient for Officers Toupin and Gillman to reasonably believe the agents had reasonable suspicions that occupants of the Escort and cab were involved in drug trafficking. The agents' suspicions

formed a valid basis for the officers to make investigatory *Terry* stops.

■ The *Terry* stops of the Escort and cab are legal if the federal agents, upon whose reports and requests Officers Toupin and Gillman relied when making the stops, actually possessed a reasonable suspicion justifying the stop of each vehicle. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), states that a police officer may make an investigatory stop of an individual whom the officer reasonably suspects is involved in criminal activity, and that the officer's reasonable suspicion is supported by articulable facts. *Id.* at 30, 88 S.Ct. 1868. In a subsequent case involving Fourth Amendment issues, the Supreme Court stated that the level of suspicion necessary for a valid *Terry* stop is not demanding:

> The Fourth Amendment requires "some minimal level of objective justification" for making the stop. *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). **That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence.** We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause, see *United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 544, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).

*United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (emphasis added). The Court also held that in evaluating the validity of a *Terry* stop, a court must consider the totality of the circumstances surrounding the stop. *Id.* at 7–8, 88 S.Ct. 1868.

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But **the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account.** Based on that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (citations omitted; emphasis added). A reasonable, particularized suspicion for *Terry* stop purposes contains two elements: first, the assessment must be based on all of the circumstances; second, the assessment of the whole picture must raise a suspicion that the particular individual being stopped is engaged in criminal activity. *Id.* at 418, 101 S.Ct. 690.

■ In this case, federal agents had all the investigatory and surveillance information delineated above: Ukoha's unusual and suspicious travel plans and luggage arrangements; Ukoha's hotel arrangements; Ezekwemba and Butler's contact with Ukoha at the inn; Ezekwemba and Butler's departure of the inn with the white bag; Ukoha and Obioha's departure of the inn with the blue duffle bag and black garment bag; and Obioha's driving behavior. This information was more than sufficient to create a reasonable suspicion, for each vehicle stopped, that the occupants of the vehicle were involved in drug trafficking.

Under the totality of the circumstances analysis, the agents had articulable facts that, when assessed considering the whole picture, raised reasonable and particularized suspicion that all four defendants were involved in drug trafficking. These reasonable suspicions validate the officers' *Terry* stops of the Escort and cab. Therefore, the evidence seized in the searches of those vehicles was obtained in accordance with Fourth Amendment principles.

## B. Arrest of Butler and search of her vehicle.

■ Although Redford and Southfield police officers stopped the cab and Escort for identification and investigation based on reasonable suspicions of federal agents, the Redford police officers did not know to look

*inside* the board game Butler carried until after federal agents and Southfield police officers called and told them of the cocaine discovered in the board game Ukoha carried. Not until this time did the Redford police arrest Butler and then search her vehicle looking for the board game they knew she had given to Carole. Considering the totality of the circumstances in this case, it is clear that the Redford police acted upon the reasonable suspicions of other law enforcement officers, based on articulable facts, that Butler was involved in drug trafficking, (1) when they stopped the cab, patted her down questioned her, *and* (2) when they arrested her and seized the white bag from her car.

## C. Search warrants.

The Redford and Southfield police conducted valid *Terry* stops with subsequent searches of the vehicles. The Fourth Amendment does not require warrants for searches of vehicles that police have probable cause to believe contain contraband, or for searches of containers within vehicles that reasonably could contain the contraband sought. *United States v. Ross*, 456 U.S. 798, 806–09, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). The local police officers had probable cause to believe the vehicles contained illicit drugs based on the information obtained from federal agents who observed the occupants of the vehicles engage in activities indicative of drug trafficking. Thus, both the stop and the search of each vehicle, without search warrants, were justified under federal jurisprudence.

### CONCLUSION

For the reasons discussed herein, all defendants' motions are hereby DENIED.

**IT IS SO ORDERED.**