**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lino A. CELIO, Defendant–Appellant.**

**No. 90–2972.**

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1991.

Decided Oct. 2, 1991.

Richard N. Cox, Asst. U.S. Atty., Danville, Ill., Rodger A. Heaton, Asst. U.S. Atty. (argued), Springfield, Ill., for plaintiff-appellee.

David J. Peilet, Chicago, Ill., for defendant-appellant.

Lino A. Celio, pro se.

Before CUDAHY and MANION, Circuit Judges, and WILL, Senior District Judge.*

CUDAHY, Circuit Judge.

In this direct appeal from a criminal conviction, we review the defendant's contention that his suitcase was searched in violation of the fourth amendment, prohibiting the drugs found inside from being introduced at trial. Finding this and defendant's other claim of error to be without merit, we affirm the conviction.

Lino Celio was a passenger in a large truck travelling through Illinois on February 14, 1985, when the vehicle was stopped by the Illinois State Police. After the vehicle was towed to the police station and then to a garage, a search revealed that Celio's suitcase contained approximately one pound of heroin. Defendant claims the police had no probable cause to conduct this search. But his argument disregards the rather important sequence of events that took place just prior to the vehicle's search.

Toward the end of 1984, several law enforcement agencies including the DEA and the FBI conducted an investigation of a suspected large-scale drug operation smuggling heroin and other drugs from Mexico into the United States. The organization, allegedly run by one Jaime Herrera–Nevarez, maintained ties to California, Chicago, Detroit, parts of Indiana and, most directly, Texas. Pursuant to a judicial order, the FBI installed a pen register on the telephone of Jesus Herrera, a suspected collaborator, in Calumet City outside Chicago, and also began intercepting the phone calls of putative coconspirator Luis Armando Villela–Jurado. During the relevant time period, persons at these two numbers repeatedly contacted each other, two other residences in Chicago and a motel in Alsip, Illinois. We refer to those involved in this crisscrossing network as the Chicago group.

Between November 30, 1984, and the date Celio was stopped, there was likewise a flurry of activity centered around two motels in the El Paso, Texas area. In most instances, Ubaldo Esparza–Corral would register for a room at one of the motels, keep the room anywhere from four to eight days and check out. The rooms Esparza–Corral occupied would always be the source and recipient of numerous long-distance phone calls, most of them to or from members of the Chicago group. Those conversations that agents actually intercepted were frequently carried on in language recognized as drug-code. Esparza–Corral was usually accompanied in the rooms by one or more of the same group of persons, including the defendant on several occasions. One member of this El Paso group, Rodolfo Esparza–Corral, even showed up in the motel room in Alsip in late December, at about the time that room was receiving phone calls from other Chicago group members. In the same general time period, an older, five-ton white truck was first spotted on December 6, and continually appeared at or near the El Paso motels at which Esparza–Corral was staying.

The phone conversations began sounding more urgent, and by the beginning of February 1985 it became clear from the drug-code being used that a major shipment was on its way into the Chicago area. In a February 5 phone call to his motel room, Esparza–Corral reported in code that the cake had arrived, would be ready tomorrow and was being cut for the fiesta. On February 13 agents noticed three persons unloading plastic-wrapped packages and a tri-

---

* The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

ple-beam scale from a car into Esparza–Corral's room at one motel. Later that night, officers observed Esparza–Corral and Celio driving away from that same motel and out of the city in the identical five-ton white truck often spotted with the El Paso group. The truck headed north and was kept under surveillance until it was inside Illinois. At that point the DEA requested that the Illinois State Police stop and search the truck in connection with suspected drug smuggling. The police found the truck speeding illegally on an interstate highway and stopped the vehicle.

The state police towed the truck to a garage, where they searched it for a number of hours. According to the government's argument, this search was based strictly on the message from the DEA agents (and not at all on the truck's illegal speed or any apparent, suspicious activity). The officers found the heroin in the defendant's suitcase (alongside his passport) almost immediately, but only later were they able to discover the hidden compartment in the truck which contained 812 pounds of marijuana. Defendant was tried and convicted of possession with intent to distribute heroin. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i).

■ Defendant first challenges the district court's denial of his motion to suppress the heroin for fourth amendment violations. This challenge has two prongs: no probable cause existed to permit the warrantless search of the truck, or alternatively, even if the federal agents had sufficient suspicion of the transportation of contraband, their conclusory statements to the state police could not supply the arresting officers with probable cause to search. We can dispose of the first point briefly. Assuming for the moment that we may treat the state officers as if they possessed the information obtained by the federal surveillance, we affirm the finding of probable cause. We review the factual component of a probable cause determination for clear error, while the legal conclusion we review *de novo*. *United States v. Towns*, 913 F.2d 434, 439 (7th Cir.1990).

Celio does not dispute any of the factual findings of the district court, but simply argues with its interpretation of those facts. Apparently conceding under *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (and now *California v. Acevedo*, —— U.S. ——, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991)), that the authorities could properly search his suitcase for contraband if they could search the truck, the defendant contends only that no probable cause existed to search the truck. But we conclude that the facts as they appear in the district court's order support a search of the vehicle. Agents observed the same white truck on numerous occasions around the El Paso motels. Several times they saw Esparza–Corral driving the truck, either alone or with members of the El Paso group. Esparza–Corral even appeared responsible for the vehicle's maintenance. Thus the connection between the truck and the El Paso group (in which the defendant was included) was firmly established.

The agents were also justified in believing the group was involved in drug trafficking. The extensive network of phone conversations, many of them occurring in code, between the El Paso group and the Chicago group raised suspicion that a deal was taking place; the appearance of three plastic-wrapped packages and a triple-beam scale reinforced that belief. When the federal authorities observed the truck headed north almost immediately thereafter, with Esparza–Corral at the wheel, "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) (citations omitted); *see also Towns*, 913 F.2d at 439.

The defendant wonders why, if the authorities knew in Texas that the truck carried drugs, they waited until Illinois to signal an arrest. We see nothing unusual—given the agents' unconfirmed belief in the prospect of a transaction between El Paso and Chicago—in waiting until the truck made its destination clear before acting.

■ In response to our conclusion that the *federal authorities* had probable cause to search the truck, defendant protests that this probable cause was never at the disposal of the state officials making the arrest. If the state police possessed probable cause, they acquired it on February 14, when the DEA contacted the state police and requested that the truck be stopped and searched on suspicion of drug smuggling. The agents relayed none of the facts forming the basis of that conclusion. The state conducted its search on the bald assertion by the federal agents that they suspected drug trafficking.

The government could point us to no precedent directly supporting the search in this case. Still, we believe the district court's decision involved a logical extension of precedent. In *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Supreme Court recognized the validity of inter-sovereign transference of suspicion of crimes. A flyer issued by a foreign sovereign (Ohio), seeking Hensley for investigation of a completed robbery, prompted a Kentucky police officer to conduct a *Terry* stop of the suspect.[1] During the brief questioning that ensued, a fellow officer spied a gun protruding from beneath the passenger seat of the car Hensley was driving. The car was subsequently searched and the defendant was later arrested for possession of a weapon by a felon. Hensley challenged the stop itself, based as it was on a foreign state's unelaborated belief that probable cause existed to stop the suspect for questioning. The Supreme Court upheld the admission of the weapon at trial nonetheless, reasoning that the relevant question was whether the officers who issued the flyer possessed probable cause for the *Terry* stop.

We conclude that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.

469 U.S. at 232, 105 S.Ct. at 682; *see also United States v. Valencia,* 913 F.2d 378 (7th Cir.1990) (state officers' arrest of suspect based on DEA agent's probable cause suffices for fourth amendment inquiry); *United States v. Rodriguez,* 831 F.2d 162 (7th Cir.1987) (traffic stop simply to identify driver for later connection to conspiracy supported by requesting officer's probable cause), *cert. denied,* 485 U.S. 965, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988). Thus we know that probable cause known to one jurisdiction's law enforcement officers may form the basis for an investigatory stop by officers of another jurisdiction.

The case before us parallels *Hensley* in two respects. The police action was based entirely on a request from a different jurisdiction that the subject be apprehended, and the representation involved only a generalized statement without the factual details in which the suspicion was rooted. If this search can be defended at all, it must be justified, like the search in *Hensley,* on the "collective knowledge" of the various authorities involved. But this case is at once both a harder and easier case than *Hensley* and other cases relying on that decision. The case is harder because the police action in this case was far more intrusive than a mere investigatory *Terry* stop. Without any first-hand knowledge giving rise to a suspicion, the state officers interrupted the defendant's trip, towed his vehicle to the station and then to a garage and searched the truck along with its contents for four hours.

The case is easier, however, due to the more specific information available to the Illinois police before they conducted the search. Though the DEA did not inform the state officers of the intricate details of its surveillance, it did provide them with

---

**1.** In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court recognized that certain unintrusive investigative stops by the police did not require probable cause. *See also Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

the location and direction of a specific vehicle and its suspected contents. We earlier broadened *Hensley's* rule—to justify a traffic stop [2]—for just this reason:

> Unlike *Hensley*, here the automobile to be stopped with its occupant was pointed out specifically by the requesting officer, and the determining officer knew the requesting officer was coordinating a large investigation with local agencies. The state trooper was therefore merely acting as an "extension" or agent of the DEA agent and she could act on the DEA agent's suspicions.

*Rodriguez*, 831 F.2d at 166. The case is easier still because, unlike *Hensley* or *Rodriguez*, the request described a continuing crime rather than one already completed or still in the future. The increased specificity and the more exigent circumstances permit the more intrusive search based on "collective knowledge" alone.

In upholding this particular search, we do not take lightly the general requirement that the apprehending officer must have probable cause before making a warrantless stop or search. And we broaden "collective knowledge" searches with the understanding that one or both governmental entities involved stand to incur any resulting civil liability should the suspicion on which the request was based prove insufficient or the action taken in reliance on it prove excessive. *See Capone v. Marinelli*, 868 F.2d 102, 105 (3d Cir.1989) (officer arresting on basis of different jurisdiction's bulletin will have good faith defense to civil suit only if "objective reading of the bulletin" allows officer to reasonably rely on it); *Donta v. Hooper*, 774 F.2d 716 (6th Cir. 1985) (officers of arresting department potentially liable for illegal arrest founded on bulletin from sheriff's office in neighboring state), *cert. denied*, 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 760 (1987); *cf. Hensley*, 469 U.S. at 232–33, 105 S.Ct. at 682–83 ("[T]he officers making the stop may have a good-faith defense to any civil suit.... It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it.").

Nevertheless, we recognize the importance of coordinated law enforcement activities in this day of international drug cartels and interstate contraband delivery networks.

> In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction.

*Hensley*, 469 U.S. at 231, 105 S.Ct. at 681.

█ Defendant's only other argument on appeal is that the district court erred in denying him a new trial for improper remarks by the prosecution during closing argument. At trial, Rodolfo Esparza–Corral, a member of the Texas group who was already serving prison time for his involvement in the operation, testified for the defense. He was to tell the jury that he had placed the heroin in the defendant's luggage without defendant's knowledge. Before he took the stand, his own counsel and the prosecutor and defense counsel debated whether he could assert his fifth amendment privilege. His own counsel's advice was that, though already in prison, he still risked prosecution in Texas for the relevant crimes. This advice was based on the belief that the relevant Texas statute of limitations was ten years. Tr. at 139. During argument, the prosecutor suggested that Rodolfo's testimony was not credible. "What does [Rodolfo] have at risk in testifying as he did in this case? Nothing.... Nothing more could happen to him.... He is already doing his time. He is a convicted drug dealer.... He is not going to add any more years to his sentence." This argument was sustained over defendant's objection.

---

**2.** Unlike officers conducting a *Terry* stop, the officer in *Rodriguez* was requested to feign a routine traffic stop merely for the purpose of securing the identity of the driver for future use. 831 F.2d at 164.

We find the prosecution's argument neither improper nor prejudicial enough to warrant a new trial. His counsel's advice notwithstanding, Rodolfo decided to take the stand, having been fully apprised of his fifth amendment rights. This decision obviated the need for the trial judge to determine whether further prosecution in Texas was in fact possible. *Cf.* Tr. at 136 (defense counsel pointing out Rodolfo has never claimed his fifth amendment privilege). Thus at the time of closing argument, it was still unclear whether Rodolfo had risked anything by testifying. Certainly the district court had issued no instruction on the matter, either during Rodolfo's testimony or later. The government's argument was therefore potentially accurate, given the unsettled question.[3] Defendant objected immediately, on the basis that the argument was not well founded, but the district court overruled the objection (perhaps because, as we have suggested above, the judge never actually decided the privilege question). Defense counsel's proper response at that point was to argue that Rodolfo did risk further prosecution, which he did. We do not find anything improper in the course of events.

■ But even were the argument improper, it would not require that we order a new trial. In claims of error in argument, we look first to whether the argument was improper and second to whether the argument in the context of the entire proceeding deprived the defendant of a fair trial. *United States v. Mealy*, 851 F.2d 890, 903 (7th Cir.1988). This was not a close case. Evidence linked the defendant with the Texas group long before he embarked on the trip north, so his defense of ignorance was already suspect. He was, after all, travelling north in a van filled with 800 pounds of marijuana. The witness Rodolfo was a convicted drug dealer, so his credibility (the only thing at issue here) was not likely high in the first place. Finally, the government's argument was not even very prejudicial. It was true that Rodolfo was already serving a prison sentence for the crimes involved, so the witness was not chancing his very freedom. The impact on the jury would probably have been greater had the question been whether Rodolfo was risking initial prosecution for the crimes he was admitting.

We thus find Celio's claims of error to be without merit. The conviction is AFFIRMED.

---

**3.** Indeed, the government now argues that the Texas limitations period is in fact three years, leaving no privilege in this case. While it is regrettable that counsel for the government did not take the time to point this out to the court below, our disposition does not require that we reach this issue.