In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1608

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AARON WILLIAMS,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 77711—**David H. Coar**, *Judge.*

————————

ARGUED SEPTEMBER 7, 2010—DECIDED OCTOBER 25, 2010

————————

Before FLAUM, ROVNER, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. In July 2008, Chicago police officers pulled over a Suburban at the request of another Chicago police officer, who was a member of a Drug Enforcement Administration ("DEA") task force. A subsequent warrantless search of the vehicle, in which defendant-appellant Aaron Williams was a passenger, revealed a brick of cocaine. The district court denied Williams's motion to suppress the drug evidence on the grounds that the DEA task force had probable cause for the search,

which could be imputed to the officers under the collective knowledge doctrine. Williams entered a guilty plea to one count of possession with intent to distribute 500 grams or more of a substance containing cocaine, 21 U.S.C. § 841(a)(1), in which he preserved his right to challenge the suppression ruling. The district court sentenced Williams to 60 months of imprisonment. Williams appeals the denial of his motion to suppress.

For the following reasons, we affirm.

## I. Background

In the summer of 2008, the Drug Enforcement Administration ("DEA") was investigating an alleged drug-trafficking organization. In connection with that investigation, a DEA-led task force used court-authorized wiretaps to intercept phone calls made and received by individuals suspected to be involved in the drug-trafficking ring. On July 15, 2008, the DEA intercepted a series of calls between Bernardo Solano, Filiberto Hinojosa, and Leobardo Barmbila that led them to believe that a drug transaction was going to occur at a suspected stash house located in the 2700 block of North Monitor Avenue in Chicago, Illinois. During one of those calls, Hinojosa informed Solano that "the car parts" had arrived at the "shop." Agents conducted surveillance on the Monitor residence, and stopped an individual later identified as Solano after seeing him leave the house. Solano admitted that he had purchased two kilograms of cocaine at the Monitor residence. From photographs provided by DEA agents, Solano identified Hinojosa as the person from

whom he had purchased the cocaine, and Barmbila as the person who he believed had supplied the cocaine.

The following day, the DEA intercepted additional phone calls between Hinojosa and Barmbila, in which they discussed meeting the "black guy" at the "shop on Monitor" later that day. Based on those calls, DEA agents decided to conduct surveillance on the Monitor residence at the anticipated time of the transaction, and to put officers from the Chicago Police Department ("CPD") on standby to assist.

Chicago police officer Daniel Gutierrez, a member of the task force, was responsible for coordinating the DEA's efforts with the CPD. Prior to the anticipated transaction, Gutierrez met with a number of Chicago police officers, including officer Joseph Simon, and told them that a person would be coming to the Monitor residence to purchase narcotics. Gutierrez had not heard the intercepted phone calls himself, but he was in contact with the agents who had monitored the calls. Gutierrez requested that the officers position themselves in the area. He told them that he would provide them with information about the suspect vehicle, and that they should stop the vehicle after developing their own probable cause to do so.

Members of the task force conducting surveillance on the Monitor residence saw Williams and another individual, Ennis Howard, arrive in a Chevy Suburban at approximately 11:30 A.M. Howard and Williams parked the Suburban in an alley behind the Monitor residence and entered the backyard. Williams was carrying a brown shoebox. Approximately fifteen minutes later, agents saw

Howard and Williams leave the backyard carrying the brown shoebox, get in the Suburban, and drive away. Gutierrez, who was conducting surveillance near the Monitor residence, saw the Suburban drive away from the Monitor residence and turn onto Diversey Avenue. Gutierrez called Simon, gave him a description of the vehicle and the license plate, and informed him that the vehicle was heading eastbound on Diversey.

Simon and his partner began following the Suburban and eventually stopped the vehicle. Simon instructed Howard and Williams to exit the vehicle. A pat-down search revealed two bags of marijuana in Williams's pocket. A subsequent search of the Suburban by other officers who arrived on the scene led to the discovery of a brown shoebox in the back seat of the Suburban containing a brick of what was later confirmed to be a kilogram of cocaine.

Williams was charged in an indictment with one count of possession with intent to distribute 500 grams or more of a substance containing cocaine. *See* 21 U.S.C. § 841(a)(1). On March 31, 2009, Williams filed a motion to suppress the evidence seized by police following the July 16, 2008 traffic stop. At a hearing on the motion, Simon testified that, after following the Suburban for a period of time without observing any traffic violations, he pulled alongside the vehicle. Simon testified that he could see that the passenger-side occupant was not wearing a seat belt, and that he stopped the Suburban based on that violation. While Illinois law requires drivers and (most) passengers of motor vehicles to wear seatbelts, 625 ILCS 5/12-603.1(a), a police officer "may not search or inspect a motor vehicle,

its contents, the driver or a passenger solely because of" a driver or passenger's failure to wear a seat belt, *id.* at § 603.1(f); *see also* 725 ILCS 5/108-1(3). Simon testified that, at the time of the stop, he was aware that the seat belt violation would not justify a search of the vehicle or its occupants. According to Simon, when he approached the vehicle, he saw "crumbs" of marijuana on the center console and two cigar-like objects in the open ashtray. Based on what he believed to be marijuana in plain view, Simon ordered the occupants to exit the vehicle.

Williams also testified at the suppression hearing. He acknowledged that there were two unsmoked marijuana cigars in the ashtray, but stated that he had closed the ashtray when the vehicle was pulled over. He also testified that there were no "crumbs" or any other marijuana on the center console.

The district court concluded that Simon's testimony was not credible. In reaching that conclusion, the district court relied on Simon's manner of testifying, as well as on Simon's professed strategy for effecting the desired search, which the court concluded made "little sense." According to Simon, he decided to pull the Suburban over for a violation he knew did not provide him with the probable cause he needed to search the vehicle. Then, if Simon is believed, he fortuitously saw marijuana in plain view because—contrary to Williams's testimony—Howard and Williams, knowing they had a kilogram of cocaine in the back seat, left the ashtray containing marijuana open for two approaching officers to see. Finding Simon not to be credible, the district court determined that the search of the

Suburban was not supported by the seat belt violation the officers testified that they observed, or the marijuana the officers testified they observed in plain view in the Suburban. The district court nevertheless denied Williams's motion to suppress, concluding that the DEA's wiretap investigation and surveillance evidence gave the CPD officers probable cause to search the Suburban under the collective knowledge doctrine.

On December 4, 2009, Williams entered into a conditional guilty plea, reserving the right to appeal the denial of his motion to suppress. On March 2, 2010, the district court sentenced Williams to 60 months of imprisonment. This appeal followed.

## II. Discussion

On appeal, Williams challenges the denial of his motion to suppress the evidence found during the warrantless search of the vehicle.[1] In reviewing a district court's denial

---

[1] We note that while "the provider and driver of the car" has "a reasonable expectation of privacy in it[,] . . . a mere passenger" does not. *United States v. Price*, 54 F.3d 342, 345-46 (7th Cir. 1995). We have found nothing in the record to suggest that Williams—the passenger—owned the Suburban in which he and Howard were stopped. However, the government has not argued that Williams lacks standing to challenge the search of the vehicle. *See id.*; *Rakas v. Illinois*, 439 U.S. 128 (1978) (illegal search of vehicle does not infringe passengers' Fourth Amendment rights, and passengers lack standing to challenge the

(continued...)

of a motion to suppress evidence, we review conclusions of law de novo and findings of fact for clear error. *United States v. Booker*, 612 F.3d 596, 599 (7th Cir. 2010). Probable cause determinations are mixed questions of law and fact that we review de novo. *Id.*

Warrantless searches are considered *per se* unreasonable under the Fourth Amendment unless one of a few specifically established and well-delineated exceptions applies. *Arizona v. Gant*, ___ U.S. ___, 129 S.Ct. 1710, 1716 (2009). One such exception to the warrant requirement is the automobile exception, which allows law enforcement to conduct a warrantless search of a vehicle if there is probable cause to believe the vehicle contains contraband or evidence of a crime. *See United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009); *Carroll v. United States*, 267 U.S. 132, 153-56 (1925). When probable cause exists to search a vehicle, law enforcement agents are permitted to search all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments, containers, packages, and trunks. *United States v. Scott*, 516 F.3d 587, 589 (7th Cir. 2008); *United States v. Ross*, 456 U.S. 798, 823-24 (1982).

Here, our inquiry is two-fold. First, we must decide whether the DEA task force had enough information to

---

[1] (...continued)
search). Therefore, the argument is waived and we need not consider it. *Price*, 54 F.3d at 346 (the principle of "standing" is "rooted in the substantive law of the Fourth Amendment and not Article III," and consequently can be waived).

support a finding of probable cause to search the vehicle. Second, if so, we must determine whether that information can be imputed to the officers who conducted the stop and search under the collective knowledge doctrine.

### A. Probable Cause

Probable cause to search exists where, based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched. *See Zahursky*, 580 F.3d at 521; *Scott*, 516 F.3d at 589. Here, the question is whether there was "a fair probability" that contraband or evidence of a crime would be found in the Suburban; absolute certainty of such a discovery is not required. *Zahursky*, 580 F.3d at 521. The determination whether suspicious circumstances rise to the level of probable cause is a common-sense judgment, and officers are entitled to draw reasonable inferences based on their training and experience in making that determination. *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006).

We conclude that the facts known to the DEA task force supported a search of the vehicle. On July 16, 2008, agents intercepted calls between Hinojosa and Barmbila discussing a meeting with "the black guy" at "the shop" on Monitor. Agents then observed Howard and Williams arrive at the Monitor residence, enter the backyard carrying a shoebox, and exit shortly thereafter carrying the same shoebox. The day before, agents had intercepted calls between Hinojosa and Barmbila, and between Hinojosa and Solano, during which they arranged a meeting at "the

shop." Later on July 15th, agents had observed Solano leaving the Monitor residence carrying a package, which Solano subsequently admitted contained two kilograms of cocaine that he had purchased from Hinojosa and Barmbila at the Monitor residence. Taken as a whole, these facts justified the agents' belief that Howard and Williams purchased drugs at the Monitor residence, and that a search of the Suburban would uncover those drugs.

Williams argues that agents could not reasonably have believed that he and Howard went to the Monitor residence to buy drugs because the calls intercepted on July 16th did not discuss any particular drug, weight, or dollar amount—even in code. According to Williams, the calls suggest only that a meeting was to take place, not necessarily a drug transaction. As we have said before, "a finding of probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003). All that is required is a fair probability of discovering contraband. Here, the totality of the facts and circumstances—that Williams and Howard met Hinojosa and Barmbila (suspected drug dealers) at the Monitor residence (a suspected stash house), where agents knew Hinojosa and Barmbila had carried out a drug transaction as recently as the day before, and that Williams and Howard left that meeting carrying a shoebox (in which they could conceal drugs)—were sufficient to create probable cause even absent such details in the calls themselves. Moreover, that Williams and Howard's conduct on July 16th "taken in isolation, . . . might be innocently explained away" does

not preclude a finding of probable cause. *United States v. Scott*, 19 F.3d 1238, 1242 (7th Cir. 1994) ("it is of no moment that most of [defendant's] conduct . . . may have been unrelated to drug activity" where the officers, "view[ing] [the] conduct as a whole" and in light of their training and experience, concluded that defendant was engaged in drug trafficking). Here, the facts and circumstances surrounding the meeting were sufficient to justify the officers' belief, based on their experience in policing narcotics transactions, that a drug transaction had occurred.

## B. Collective Knowledge Doctrine

Having determined that the DEA task force had probable cause to search the vehicle, we consider whether the information known to the task force can be imputed to Simon under the collective knowledge doctrine. The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action. *See United States v. Hensley*, 469 U.S. 221, 232-33 (1985). There is no Fourth Amendment violation if the knowledge of the officer directing the stop, search, or arrest—or the collective knowledge of the agency for which he works—is sufficient to constitute probable cause. *United States v. Harris*, 585 F.3d 394, 400 (7th Cir. 2009). In order for the collective knowledge doctrine to apply, (1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the informa-

tion—or the agency for which he works—must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it. *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992).

We have applied the collective knowledge doctrine where, as is the case here, DEA agents asked local law enforcement officers to stop a specifically-identified vehicle, and the local officers had no knowledge of the facts underlying the DEA's probable cause. For example, in *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987), the DEA requested that Illinois State Police make a "routine traffic stop" of an individual the DEA believed was involved in drug-trafficking activities for the purpose of identifying the driver. The officer who made the stop knew nothing about the factual basis for the DEA's suspicion, other than that the DEA was coordinating a large investigation with local agencies. *Id.* at 165-66. Based on the facts of that case, which involved an admittedly "skeletal" request for assistance, we concluded that the "state trooper was . . . acting as an extension or agent of the DEA agent and she could act on the DEA agent's suspicions." *Id.* In *United States v. Celio*, 945 F.2d 180, 183 (7th Cir. 1991), Illinois State Police stopped and searched a vehicle at the request of the DEA, based solely "on the bald assertion by the federal agents that they suspected drug trafficking." As in *Rodriguez*, "the automobile to be stopped with its occupant was pointed out specifically by the requesting officer, and the [detaining] officer knew the requesting officer was coordinating a large investigation with local agencies." *Id.* at 184 (quoting *Rodriguez*, 831 F.2d

at 166). We concluded that the search was supported by probable cause because the DEA's collective knowledge could be imputed to the officers under the collective knowledge doctrine. *Id*.

The facts here are analogous to those at issue in *Rodriguez* and *Celio*. Gutierrez specifically identified the Suburban and its occupants for Simon, who was aware of the ongoing DEA investigation. In fact, Simon knew more about the underlying facts than did the local officers in *Rodriguez* and *Celio*, as he knew that the vehicle was leaving a suspected drug transaction.

Williams attempts to distance his case from *Rodriguez* and *Celio* based on Gutierrez's instruction that Simon develop his own probable cause to stop and search the Suburban. According to Williams, that statement precluded Simon from relying on the DEA's knowledge, and therefore Simon could not have been acting in objective reliance on the information he received from Gutierrez, as is required for the application of the collective knowledge doctrine. We disagree with Williams's characterization of the instruction. Gutierrez did not forbid Simon from relying on the information collected by the DEA task force. Rather, Gutierrez sought to conceal the existence of the DEA investigation and wire taps from Williams and Howard. That effort has no impact on the fact that the DEA agents had probable cause, on which Simon was entitled to rely.

Other appeals courts similarly have concluded that the application of the collective knowledge doctrine is unaffected by an officer's use of a cover story to disguise a stop

as a mere traffic stop. *See United States v. Chavez*, 534 F.3d 1338, 1341-42 (10th Cir. 2008) (where officer stopped suspect at DEA's request, the fact that the officer pretended that the stop was for a failure to turn on headlights in order to conceal a confidential informant's identity and protect the integrity of the DEA investigation did not preclude the application of the collective knowledge doctrine); *United States v. Ramirez*, 473 F.3d 1026, 1038 (9th Cir. 2007) (Kozinski, J., concurring) ("disguising the stop as a 'traffic stop' was a valid law enforcement tactic calculated to ensure an officer's safety . . . [and] did not change the nature of the stop," or the fact that the stop was made at the direction of an officer who had probable cause, such that the collective knowledge doctrine applies). Moreover, the Fifth and Tenth Circuits have considered instructions like the one Gutierrez gave Simon, and concluded that such an instruction does not bar the application of the collective knowledge doctrine.

In *United States v. Ibarra-Sanchez*, 199 F.3d 753 (5th Cir. 1999), a DEA agent instructed the local police dispatcher to issue a radio bulletin stating that a DEA agent needed assistance in stopping a van suspected to be transporting drugs or weapons, and that the officers should form their own reasonable suspicion before stopping the van. *Id.* at 757. The DEA agent asked local authorities to make the stop to avoid revealing the existence of the DEA investigation. *Id.* at 757 n.1. The dispatcher issued the bulletin, but did not include the instruction that officers form their own reasonable suspicion. *Id.* at 757. After hearing the bulletin, a police officer and SWAT team stopped the van. 199 F.3d at 757. The Fifth Circuit held that the stop was constitu-

tional because the DEA agent's knowledge could be imputed to the officers under the collective knowledge doctrine. *Id.* at 759-60. The court noted that the dispatcher's "failure to relate [the agent's] instruction that the [local police] officers form their own reasonable suspicion before stopping the van" was "irrelevant." *Id.* at 760 n.6. The court found the defendants' argument to the contrary to be "immaterial . . . because under the 'collective knowledge' doctrine, the [local] officers did not need to form their own suspicion." *Id.* As Williams points out, the message about developing independent suspicion was not relayed to the detaining officers in *Ibarra-Sanchez*, while Gutierrez's instruction was communicated to Simon here. But the Fifth Circuit's description of the dispatcher's failure to pass on the instruction as "irrelevant," and its characterization of the defendants' argument that the failure somehow was relevant as "immaterial," indicate that the court would have concluded that the collective knowledge doctrine applied regardless of whether the instruction was included in the bulletin. *Id.*

   *Chavez* is even more factually analogous to the instant case. There, the requesting DEA agent instructed the state police officer tasked with stopping a vehicle suspected to be transporting cocaine to develop his own probable cause for stopping the vehicle. 534 F.3d at 1341. The Tenth Circuit found that the stop was proper under the collective knowledge doctrine because the DEA agent who requested the stop had probable cause. *Id*. at 1348. The court apparently found the instruction that the officer develop his own probable cause to be of no consequence to the collective knowledge inquiry, as it did not address the instruction,

except to note that the officer's use of a cover story to conceal the reason for the stop "was a valid law enforcement tactic." *Id.* (quoting *Ramirez*, 473 F.3d at 1038 (Kozinski, J., concurring)).

Williams also contends that the collective knowledge doctrine does not apply because Simon testified that he did not rely on the information he received from Gutierrez to justify the search. But Simon's subjective reasons for making the stop and initiating the search are irrelevant, as "[s]ubjective intentions play no role in the ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996) (case law "foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); *see also Florida v. Royer*, 460 U.S. 491, 507 (1983) (the fact that officers acted on one rationale in conducting a search does "not foreclose the [government] from justifying [the search] by proving probable cause"). Therefore, Simon's motivations for the stop and search do not affect the collective knowledge doctrine analysis.

Our decision is consistent with the Ninth Circuit's opinion in *Ramirez*. In *Ramirez*, a police sergeant requested that a uniformed officer make a "traffic stop" of a car suspected to have been involved in a drug transaction. 473 F.3d at 1029. A uniformed officer made the requested traffic stop when he observed the car straddling two lanes. *Id.* The defendants argued that the stop was invalid because lane-straddling is not illegal. *Id.* at 1030. Based on *Whren*, the Ninth Circuit concluded that neither the fact

that the officer "was directed to make a traffic stop," nor the fact that he may not have had "valid grounds to make the traffic stop because of lane-straddling," was relevant because the officer had probable cause based on the collective knowledge doctrine. *Id*. at 1030.

Williams maintains that even if the collective knowledge doctrine applies, only Gutierrez's knowledge—and not that of the entire DEA task force—can be imputed to Simon. Williams asserts two arguments in support of that position. First, he contends that the knowledge gleaned from the wiretaps cannot be imputed to Simon because Gutierrez did not listen to the wiretap conversations. Second, he argues that the knowledge of the DEA agents (*i.e.*, the substance of the wire tap conversations) cannot be imputed to Gutierrez because he worked for a different agency, the CPD. We address each argument in turn.

As noted above, Gutierrez was a member of the DEA-led task force. He testified that, prior to briefing Simon and the other CPD officers, he became aware that calls had been intercepted indicating that there was going to be a narcotics sale at the Monitor residence. Gutierrez was in radio contact with members of the surveillance team who informed him that they had observed Howard and Williams enter and leave the Monitor residence carrying the shoebox. Therefore, based on communications with other task force members, Gutierrez had indirect knowledge of the facts supporting probable cause.

We previously have held that whether the requesting officer had direct knowledge of the facts supporting his suspicion is "inconsequential" where the agents in posses-

sion of the knowledge and the requesting agents are "part of a coordinated investigation" and are in communication. *Nafzger*, 974 F.2d at 914. The knowledge of a team of officers "work[ing] together closely in monitoring [a] drug transaction as it unfold[s] . . . 'may be mutually imputed'" even the absence of "'express testimony that the specific or detailed information creating the justification for the stop was conveyed.'" *United States v. Parra*, 402 F.3d 752, 766 (7th Cir. 2005) (quoting *Nafzger*, 974 F.2d at 911). Therefore, knowledge of the information contained in the intercepted phone calls can be imputed to Gutierrez based on his role in the task force's investigation.

Williams's second objection also fails to carry the day, although we recognize that the language of some of our precedents may be misleading. We have said that knowledge may be imputed to an officer "so long as the knowledge of the officer directing the [challenged action], or the collective knowledge of *the agency he works for*, is sufficient to constitute probable cause." *United States v. Valencia*, 913 F.2d 378, 383 (7th Cir. 1990) (emphasis added). That language was designed to recognize that the knowledge of other officers may be imputed to the requesting officer, so long as the officers are in close communication with one another. Here, Gutierrez was assigned to the DEA task force and worked closely with DEA agents on the drug trafficking investigation. That he carried a badge issued by the CPD, not the DEA, does not preclude the application of the collective knowledge doctrine. Therefore, the district court correctly imputed the DEA task force's knowledge to Gutierrez and Simon.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.