**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2236-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CEDRIC A. PARRISH,

     Defendant-Appellant.

_____

Argued March 5, 2019 – Decided July 19, 2019

Before Judges Yannotti, Rothstadt, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 13-10-1372 and 13-10-1373.

Kimberly A. Yonta argued the cause for appellant.

Valeria Dominguez, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Claudia Joy Demitro, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Cedric A. Parrish appeals from his convictions for second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b). After denying defendant's motion to suppress, and following the jury's verdict, the court sentenced defendant to five years of imprisonment with three and one-half years of parole ineligibility on the unlawful possession of a weapon charge, and a concurrent five-year sentence, subject to five years of parole ineligibility on the certain persons offense.

Defendant raises the following issues on appeal, which we have renumbered for ease of reference:

> POINT I
>
> THE EVIDENCE RECOVERED FROM THE DEFENDANT MUST BE SUPPRESSED BECAUSE THE POLICE DID NOT HAVE REASONABLE ARTICULABLE SUSPICION TO STOP THE CAR, NOR DID THE POLICE HAVE PROBABLE CAUSE TO ARREST THE DEFENDANT.
>
> POINT II
>
> AN INVESTIGATIVE STOP, AS IT IS A WARRANTLESS INTRUSION ON AN INDIVIDUAL'S LIBERTY, MUST BE CONDUCTED IN THE LEAST INTRUSIVE WAY POSSIBLE IN BOTH TIME AND SCOPE.
>
> POINT III

A-2236-17T4

THE INVESTIGATIVE STOP QUICKLY TRANSFORMED INTO A DE-FACTO ARREST, REQUIRING THE POLICE TO HAVE PROBABLE CAUSE.

POINT IV

WITHOUT PROBABLE CAUSE TO ARREST AS PART OF THE ORIGINAL INVESTIGATION, THE POLICE LACKED THE LEGAL JUSTIFICATION FOR THE CONTINUED DETENTION.

POINT V

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTIONS FOR A JUDGMENT OF ACQUITTAL OF THE TWO CONVICTIONS AND FOR A NEW TRIAL.

After reviewing the record in light of the contentions on appeal and the applicable law, we affirm.

I.

We glean the following facts from the record. Access Self Storage (Access) is an outdoor self-storage facility located in Woodbridge. Access has "a secure gate" with a keypad that requires entry of a valid code to access the individual storage units. When an individual enters a rental agreement with Access, the renter receives a four-digit personal number that, combined with the number of the renter's particular storage unit, serves as the access code to enter the facility. A separate key is required to open the units.

3

On June 1, 2013, two Access employees "smell[ed] a strong odor of raw marijuana emanating from unit 9066." Consistent with Access policy, which permits employees to unlock a renter's storage unit if it contains prohibited items, an Access employee entered unit 9066, opened a chest inside the locker, and saw "two large bags of green leafy substance" that he "believe[d] to be marijuana."

Later that same day, one of the Access employees who had smelled the marijuana called the Woodbridge police. Officer Robert Bartko responded at around 4:00 p.m., entered vacant unit 9065, which adjoined storage unit 9066, and "smelled an odor of raw marijuana inside the locker." The odor was strongest on the right side of the locker, adjacent to unit 9066. Because unit 9066 was occupied, Bartko "called for a supervisor" and "also asked for a [canine] unit to come [with] a detective."

Sergeant Nelson[1] arrived first, and he also smelled marijuana emanating from the locker. At 5:00 p.m., Detective Bryan Jaremczak received a phone call from his supervisor, Sergeant Murphy, who asked him "to respond to

---

[1] The first names of Sergeants Nelson and Murphy, and Officer Cruz are not provided in the record.

Access . . . to assist patrol in a narcotics investigation." Jaremczak reached the facility by 5:50 p.m., at which point he was "in charge" of the investigation.

"Within a couple minutes," Officer Cruz and his canine arrived. According to Jaremczak, "[t]he dog went into [storage unit] 9065 and was smelling the[] adjoining wall very aggressively." After the dog smelled the exterior of unit 9066, it "had a positive hit for the odor of narcotics."

An Access employee informed Jaremczak of the facility's access code protocol and that each entry into the facility is logged electronically. Jaremczak reviewed the rental agreement for unit 9066, Access' rules and regulations, and a list of prohibited items. The original rental contract was entered between Access and Ramon Marti, defendant's stepfather, for storage unit 4032, but an addendum to the agreement transferred Marti's rights in unit 4032 to unit 9066. Both the original agreement and the addendum listed Marti's Perth Amboy address.

Shortly after 6:00 p.m., Sergeant Christopher McClay responded to Access to relieve Bartko. McClay "stayed in [his] patrol car and stayed exactly where [he] was told to stay and keep surveillance of the storage unit," specifically in a parked position parallel to unit 9066. Jaremczak decided to apply for a warrant to search the locker, so he returned to police headquarters

to attempt to contact an on-call judge. Initially, no on-call judge was available, but the prosecutor eventually reached a judge "who was out of state at the time," and advised that he was on his way home and would call back once there.

Meanwhile, McClay saw a silver "sedan type" vehicle with tinted windows slowly drive by the locker and observed that the driver was staring at the locker the entire time without noticing McClay. McClay "thought that was odd," so he wrote down the license plate number and relayed the information to Jaremczak. Shortly after McClay contacted Jaremczak, an Access employee informed McClay that at 8:09 p.m., a code specific to locker 9066 was used to enter the gate, and Jaremczak was later made aware of that information.

Jaremczak advised dispatch of the license plate number and told them to put out an alert for the vehicle, as he needed the "car stopped if somebody could find it." At around 8:30 p.m., Jaremczak called then-Sergeant Joseph Licciardi, who was on patrol, and told him to "detain" the vehicle. Jaremczak advised Licciardi that a "vehicle went into the suspect location, drove down the specific aisle where a locker is," and that the vehicle's registration address matched the address listed for the specific locker. Jaremczak also told

Licciardi that the vehicle's registered owner, defendant, had a prior drug distribution conviction.

Two minutes later, Licciardi saw defendant's vehicle driving near the Access facility and pulled it over. Licciardi approached the vehicle and asked defendant what he was doing at Access. Defendant gave conflicting answers, then produced valid identification, and Licciardi returned to his vehicle for the next twenty-seven minutes. Meanwhile, at 8:34 p.m., the judge contacted the prosecutor and Jaremczak to initiate the warrant application process, which concluded twenty minutes later.

While back in his patrol vehicle, Licciardi performed a warrant check for defendant. He also spoke with Lieutenant Joseph Goodheart, who explained, "[w]e're in the process of getting [a search warrant]." Goodheart told Licciardi to "[j]ust make [defendant] wait for a while." After the phone call, Licciardi stated, "[t]his is ridiculous," but testified at the suppression hearing that he did not know why he said that. Licciardi also testified he did not know whether he had enough information at that time to arrest defendant.

Approximately seven minutes into the stop, Licciardi called McClay and asked whether "[t]hat storage locker . . . [was] registered to this guy I got pulled over?" McClay explained that the vehicle drove past him at the gated

7

facility, the driver stared at the particular locker that smelled of marijuana, did not notice McClay, and that the driver of the vehicle used a code specific to the locker to open the gate. Licciardi responded, "[g]ot it," stated that he initially thought he stopped defendant for "no reason, basically," and then told McClay that since defendant's "got the code. . . . he's done."

About twenty-nine minutes into the stop, defendant waved at Licciardi to get his attention, so Licciardi approached and asked defendant to exit the vehicle. Defendant then received a phone call, and Licciardi instructed him not to use his phone while they were talking. Within the next seven minutes, thirty-six minutes into the stop, Jaremczak arrived.

Jaremczak informed defendant, "I just got a search warrant for your storage facility." Defendant said "okay," then began denying that he had a storage unit at the facility before Jaremczak asked him about the vehicle he was driving. Approximately three minutes later, the officers placed defendant into the back of the police vehicle and asked for his phone.

Defendant sat in the back of the police vehicle but would not put his feet in the vehicle, so the officers removed defendant from the car, instructed him to place his hands behind his back and forcibly handcuffed him. Licciardi testified that he also "punch[ed] [defendant] in the head because he was

refusing to submit." Defendant was placed in the back of the vehicle forty-two minutes after the initial stop.

Jaremczak searched the locker three minutes later. He recovered, among other items, receipts and paperwork in defendant's name, receipts with Ramon Marti's name on them, 200 grams of marijuana, a red marijuana grinder, and a locked Century safe. Licciardi brought defendant to police headquarters, and Jaremczak returned to defendant's vehicle to have the car towed.

Jaremczak testified that he personally drove defendant's vehicle onto the back of the tow truck and then off of the truck when they reached the tow yard, and retained the key to defendant's car. Defendant's car key was on a keychain along with a Century key, which Jaremczak used to open the safe he recovered from the locker. Inside the safe was a loaded semi-automatic handgun.

Thereafter, defendant was charged with third-degree possession with intent to distribute marijuana in a quantity between one ounce and five pounds, N.J.S.A. 2C:35-5(a)(1) and (b)(11); fourth-degree possession of a controlled dangerous substance (CDS), marijuana, in a quantity exceeding fifty grams, N.J.S.A. 2C:35-10(a)(3); second-degree possession of a firearm while engaged in CDS activity, N.J.S.A. 2C:39-4.1; second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); second-degree possession of a weapon for

unlawful purposes, N.J.S.A. 2C:39-4(a); second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b); and two disorderly persons offenses, obstruction of the administration of law, N.J.S.A. 2C:29-1(a), and resisting arrest, N.J.S.A. 2C:29-2(a)(1).

Prior to trial, defendant filed a motion to suppress the evidence "seized from [his] vehicle and from [his] person" during and after the traffic stop. At the suppression hearing, Jaremczak explained that he "ask[ed] [defendant] to sit in the back of a cop car to be detained," and did not want defendant "to have a cell phone" because he did not "know if there's a weapon in that phone, razor blades," or if defendant was "going to make phone calls to send people. You don't know what he could do with it." As to whether he believed he had probable cause to arrest defendant at the time he arrived, Jaremczak testified:

> A.  I didn't want to.  No.  Not at that moment.
>
> Q.  I didn't ask if you wanted to.  I asked if legally, you had any authority, in your professional opinion, Officer, to arrest Mr. Parrish.
>
> A.  I believe yes. I would.  Based off of the raw marijuana coming from that locker, he enters a secure facility, drives past the locker, and the registration for that vehicle matches the registered address of that locker.
>
> Q.  Okay.

A.   I believe so.  Yes.  That I would.

Q.   Okay. So let's . . . take that hypothesis.  Let's take that theory, then.   You had all the information that you just placed on the record.   All of that information that you said gives you enough to arrest Mr. Parrish was at your disposal at the time that Sergeant Licciardi made the motor vehicle stop.  You knew all of that by then.  Correct?

A.   Yes.

When asked why he did not arrest defendant when he arrived at the scene if he had probable cause to do so, Jaremczak testified, "I knew that there was only a few more minutes from the time I left there to execute the search warrant.  I wanted to be as thorough as possible and make sure -- I want to actually see the evidence in front of me before I place handcuffs on someone."

At the conclusion of the suppression hearing, the court found:

> Here, the information is that there was a suspicion that there was raw marijuana . . . in locker 9066, located at the Access storage facility.   There was information that a car that was driven by this defendant . . . went on the property.   The testimony is, and it's uncontroverted testimony . . . [that] . . . [t]he only way to get on that property is to punch in a code. . . .   The code that he punched in was not a general access code that gives general access to the property, but a code that was specifically tied to 9066.
>
> Much has been made of the fact that the person listed on the rental agreement was not the defendant. But the fact was that the . . . defendant shared a residence –

11

[the] same exact address as the person on the code (sic). He drives onto the property, drives past 9066, and then drives away. His actions are noticed. Information is put out that this car should be stopped because there's now reasonable suspicion that this individual is connected to 9066.

A warrant is obtained telephonically and . . . just before the warrant is obtained, the car is identified by Sergeant Licciardi and the car is stopped. The car is stopped because of this connection to the locker. It's not stopped for any tinted windows or anything of the sort. Why this officer insisted to say that, I do not know.[2] But it does not change the analysis. That was the reason for the car stop. That car stop was legitimate. And the police properly detained him until the information was obtained, the search warrant was obtained.

The Court does not find that the . . . stop, which was [forty-five] minutes in length, was unreasonable. There's no evidence that the police actions here were dilatory or delayed the process or pretextual. There was a reasonabl[e] suspicion that tied this individual to that locker. This is not someone who just drove by an open road or things of that sort. There was a strong, strong connection to that locker.

The detention, the Court finds, is reasonable under the Constitution.

---

[2] Licciardi testified that he initially stopped the car because it had tinted windows, but on cross-examination he was confronted with the videotape that showed he began writing the tinted-window ticket only after he received a phone call from McClay who mentioned defendant's tinted windows.

After the court denied defendant's pre-verdict motion for judgment of acquittal, the jury found defendant guilty of the unlawful possession of a weapon and certain persons not to have weapons charges, and acquitted him of all of the drug-related charges.[3] The court denied defendant's post-verdict motions for a judgment of acquittal and a new trial, and this appeal followed.

## II.

In defendant's first four points, he maintains the police lacked reasonable and articulable suspicion to conduct a <u>Terry</u>[4] stop of his vehicle, so the warrantless investigatory detention was invalid at its inception, and the seizure "of his keys without probable cause" was improper. Further, defendant contends the police "prolong[ed] the stop beyond its mission," and the forty-minute delay from the time of the stop to his arrest was unreasonable. According to defendant, the police should have let him leave when they learned he "did not own the locker," and the officers transformed the investigatory detention into a de facto arrest when they ordered defendant into the back of the police vehicle. Thus, defendant claims the police lacked both

---

[3] The court dismissed the charge of possession of a weapon for unlawful purposes prior to trial. At sentencing, the court dismissed the two disorderly persons charges.

[4] <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

reasonable articulable suspicion and probable cause to believe he committed a crime at the inception of the stop, and that they did not gain any information to give them probable cause to arrest defendant by the time they placed him in the back of the police vehicle.

The State maintains the "initial stop of defendant was lawful and based on reasonable, articulable suspicion," and "was not prolonged such that it amounted to de facto arrest." Further, the State argues that "even if the stop amounted to de facto arrest, there was sufficient probable cause for the officers to arrest defendant." Alternatively, the State contends that if "there was a de facto arrest and there was no probable cause, defendant's decision to obstruct justice and resist arrest sufficiently attenuated the causal link between the unlawful arrest and the evidence seized."

We disagree with defendant's arguments and affirm his convictions because we conclude that the police not only had a reasonable articulable suspicion to conduct a Terry stop of defendant, but they also had probable cause to arrest him at the time he was initially stopped by Licciardi. Accordingly, we affirm the court's decision denying defendant's motion to suppress, and affirm his convictions.

III.

14

When reviewing a decision on a motion to suppress evidence, appellate courts defer to the judge's factual findings "unless they [are] 'clearly mistaken' or 'so wide of the mark' that the interests of justice require[] appellate intervention." State v. Elders, 192 N.J. 224, 245 (2007). However, the motion judge's "legal conclusions reached from the established facts" are reviewed de novo, as the court's "application of the law is subject to plenary review on appeal." State v. Jefferson, 413 N.J. Super. 344, 352 (App. Div. 2010).

As noted, the motion judge found "[t]here was a reasonabl[e] suspicion that tied [defendant] to that locker," indeed, "a strong, strong connection to that locker." Therefore, the court concluded the detention was "reasonable under the Constitution," and denied defendant's motion on that ground. The court did not, however, address whether the investigative stop became a de facto arrest when defendant was ordered into the police car, or whether the police had probable cause to arrest at that moment or when the stop was initiated. Nonetheless, the judge's findings that the police had reasonable and articulable suspicion to detain defendant are amply supported by the record, and the legal consequences that flow from those facts demonstrate not only that the Terry stop was valid at its inception, but also that the police had probable cause to arrest defendant before the alleged de facto arrest occurred.

15

In order to thoroughly address all of defendant's arguments, we detail the constitutional principles supporting a detention pursuant to a Terry stop and after a formal arrest. Our federal and state constitutions safeguard the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. Warrantless seizures are presumptively unreasonable, and the State bears the burden of proving by a preponderance of the evidence that an exception to the warrant requirement applies. State v. Pineiro, 181 N.J. 13, 19-20 (2004). Here, the State invoked the Terry stop exception to the warrant requirement to justify the warrantless seizure of defendant's vehicle and person.

An investigatory detention or Terry stop occurs "when an objectively reasonable person feels that his or her right to move has been restricted." State v. Nishina, 175 N.J. 502, 510 (2003) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)); see Whren v. United States, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment].").

A temporary <u>Terry</u> stop is proper "if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." <u>Pineiro</u>, 181 N.J. at 20 (quoting <u>Nishina</u>, 175 N.J. at 510). However, an investigative stop based on "a mere hunch" is invalid. <u>State v. Coles</u>, 218 N.J. 322, 343 (2014).

> The reasonableness of a continued detention is determined through application of a two-pronged inquiry. First, the detention must have been reasonable at its inception. Second, the scope of the continued detention must be reasonably related to the justification for the initial interference. Thus, the detention must be reasonable both at its inception and throughout its entire execution.
>
> [<u>Id.</u> at 344 (citations omitted).]

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." <u>State v. Chisum</u>, 236 N.J. 530, 547 (2019) (alteration in original) (quoting <u>Rodriguez v. United States</u>, 575 U.S. __, 135 S. Ct. 1609, 1612 (2015)). While "the duration of the investigative stop may be extended for a reasonable but limited period for investigative purposes," a delay that is "unnecessary to the legitimate investigation of the law enforcement officers" is unreasonable. <u>Id.</u> at 546 (first quoting <u>Coles</u>, 218 N.J. at 343-44; then quoting <u>United States v. Sharpe</u>, 470 U.S. 675, 687 (1985)). Ultimately, the lawfulness

17

of a <u>Terry</u> stop depends on "the totality of the circumstances," <u>State v. Privott</u>, 203 N.J. 16, 28 (2010), including "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." <u>Chisum</u>, 236 N.J. at 547 (quoting <u>State v. Dickey</u>, 152 N.J. 468, 477 (1998)).

Here, the motion judge correctly concluded the investigatory detention was reasonable and valid at its inception. When McClay witnessed defendant's vehicle slowly drive by the marijuana locker at a gated facility, looking at the locker the entire time, McClay suspected something suspicious; he "just . . . thought that was odd." When Jaremczak learned the vehicle was registered to the same address as the rental agreement, he had a reasonable, articulable suspicion that the vehicle was associated with the marijuana in that locker. Jaremczak testified that he disclosed those facts to Licciardi before the initial stop, and Licciardi stated that Jaremczak also told him defendant had a prior CDS conviction.

Further, we disagree with defendant's claim that the police should have ended the detention once they determined he was not the registered owner of the locker. Whether defendant was in constructive possession of the marijuana inside the locker does not depend on whether he was the lessee of the storage

unit, or on whether he owned the drugs. See State v. Brown, 80 N.J. 587, 598 (1979) ("Ownership in conjunction with possession is not a required element of the possessory crime; one can knowingly control something without owning it and be guilty of unlawful possession."). Rather, the relevant inquiry is whether defendant had "knowledge of [the marijuana's] character" and "an intention to exercise control over it manifested in circumstances where it is reasonable to infer that the capacity to do so exists." Id. at 597. Here, the police had a reasonable, articulable suspicion that defendant had such knowledge, intent, and capacity.

We need not address defendant's argument that the investigatory detention became a de facto arrest requiring probable cause, because even if it was a de facto arrest, we conclude the police had probable cause to arrest defendant at the inception of the Terry stop. "Probable cause exists when, considering 'the totality of the circumstances,' a person of 'reasonable caution' would be justified in believing that" a crime has been, or is being committed. See State v. Smith, 212 N.J. 365, 388 (2012) (quoting Schneider v. Simonini, 163 N.J. 336, 361 (2000)).

Before Licciardi stopped defendant, Jaremczak told him that defendant's vehicle entered Access, "drove down the specific aisle" where unit 9066 was,

19                                                          A-2236-17T4

and that the vehicle was registered to the same address as the locker's registered owner. Jaremczak learned those facts through his communication with McClay, who witnessed the events unfold and wrote down defendant's license plate number. In addition, prior to the stop, McClay knew that at 8:09 p.m. defendant used the entry code specific to locker 9066 to enter the gate.

When the police are involved in a collaborative investigation, the probable cause analysis is not limited to the knowledge possessed by the officer who effects the arrest. United States v. Belle, 593 F.2d 487, 497 n.15 (3d Cir. 1979) ("The collective knowledge of the investigating officers is measured in determining probable cause."); Wood v. Crouse, 436 F.2d 1077, 1078 (10th Cir. 1971) (same); see also United States v. Hensley, 469 U.S. 221, 229-33 (1985) (holding that officers who detain a suspect in reliance on a "wanted flyer" do not violate the Fourth Amendment if the flyer-issuing agency had reasonable, articulable suspicion "that the wanted person has committed an offense"); State v. Crawley, 187 N.J. 440, 457-58 (2006) ("if the dispatcher in th[at] case had been provided adequate facts from a reliable informant to establish a reasonable suspicion that defendant was armed, common sense tells us that the dispatcher had the power to delegate the actual stop to officers in the field").

20

Because McClay, Jaremczak, and Licciardi were "'part of a coordinated investigation' and [we]re in communication," their "collective knowledge" is imputed to each other. United States v. Williams, 627 F.3d 247, 255 (7th Cir. 2010). Thus, the information that an Access employee conveyed to McClay before the Terry stop, that defendant used a code specific to locker 9066 to access the secure gate, is imputed to Licciardi as a fellow investigating officer. We therefore conclude that the police had probable cause to arrest defendant at the inception of the Terry stop.

In sum, the police had probable cause to believe defendant had constructive possession of marijuana when they knew he used the code specific to locker 9066 to access the facility in a car registered to the same address as the lessee and slowly drove by the locker, staring at it the entire time. Those facts were within the collective knowledge of the collaborating officers at the time of the initial Terry stop, and give rise to "a fair probability" that defendant had dominion and control over the marijuana in the storage locker. See Pineiro, 181 N.J. at 29.

Moreover, "[j]ust as a subjective belief by the arresting officer would not establish probable cause where none existed, a subjective belief by the arresting officer cannot destroy probable cause where it exists." United States

v. Anderson, 923 F.2d 450, 457 (6th Cir. 1991). Thus, notwithstanding Licciardi's subjective doubts, the police had probable cause to arrest defendant at the time of the initial detention.[5]

## IV.

In defendant's fifth point, he claims the court erred in denying his applications for judgments of acquittal and for a new trial. We disagree.

The standard governing a motion for a judgment of acquittal is whether, "viewing the State's evidence in its entirety . . . and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt." State v. Reyes, 50 N.J. 454, 458-59 (1967). In addition, the trial court's ruling on a motion for a new trial "shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. Combining these two standards, defendant alleges it is in the interest of justice to grant him a new trial because the jury's verdict was against the weight of the evidence.

---

[5] In light of our decision, we do not reach the State's alternative argument that defendant's act of not placing his feet in the police car furnished probable cause to justify an arrest sufficient to attenuate any unlawful detention.

A-2236-17T4

"Any person who knowingly has in his possession any handgun . . . without first having obtained a permit to carry the same . . . is guilty of a crime of the second degree." N.J.S.A. 2C:39-5(b). At trial, McClay testified that he witnessed the driver of a silver car staring at unit 9066, so he recorded and disseminated the license plate number. Shortly thereafter, Licciardi witnessed defendant driving that vehicle near the storage facility, which prompted the Terry stop. The fact that defendant's vehicle was registered to the same address as the rental agreement gives rise to a reasonable inference that defendant was at Access in connection with unit 9066. That storage locker contained the Century safe in which the gun was found and to which defendant had a key. In addition, the parties stipulated that a records custodian "caused the records of the [New Jersey State] Firearms Investigation Unit to be thoroughly searched with regard to [defendant]," the "search failed to reveal" that defendant applied for a permit, and the gun seized from the locker was "not registered with the New Jersey State Police."

Further, the fact that defendant entered the code specific to unit 9066 demonstrated his access to that unit even though, as defendant stresses, the police were not able to locate the key to the locker itself. Although defendant contends the State could not satisfy its burden of proving his guilt beyond a

23

reasonable doubt without affirmative proof that he had the key to the locker, we conclude that was a proper question for the jury to decide. Moreover, as the trial court concluded, a reasonable juror could have found the Century key on defendant's keychain, which opened the safe recovered from the locker, established beyond a reasonable doubt that defendant had access to and control over the gun inside the safe.

We therefore find no basis to disturb defendant's conviction for unlawful possession of a weapon under N.J.S.A. 2C:39-5(b). Similarly, because the jury found defendant guilty of that charge, and because defendant previously committed a predicate offense, the evidence supports his conviction for certain persons not to have weapons under N.J.S.A. 2C:39-7(b).

To the extent we have not specifically addressed any of defendant's arguments it is because we deem them without sufficient merit to warrant discussion in a written opinion. R. 2:11–3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2236-17T4